State ex rel. THOMSON, Attorney General, Petitioner, vs. GIESSEL, Director of Department of Budget and Accounts, Respondent.

*May 9—June 3, 1952.*

54

The *Attorney General* and *Harold H. Persons* and *E. Weston Wood,* assistant attorneys general, for the petitioner.

For the respondent there were briefs by *San W. Orr,* attorney, and *Thomas, Orr, Isaksen & Werner* of counsel, all of Madison, and oral argument by *Mr. Orr* and *Mr. Leon E. Isaksen.*

Briefs *amici curiae* were filed on behalf of the Wisconsin Education Association by *Toebaas, Hart, Kraege & Jackman* of Madison, and on behalf of the Wisconsin Federation of Teachers by *Padway, Goldberg & Previant* of Milwaukee.

BROWN, J. Sec. 26, art. IV of the Wisconsin constitution states:

"*Extra compensation; salary change.* Section 26. The legislature shall never grant any extra compensation to any · public officer, agent, servant, or contractor, after the services

shall have been rendered or the contract entered into; nor shall the compensation of any public officer be increased or diminished during his term of office."

Sec. 42.535, Stats., provides that every qualified retired teacher "shall be paid an additional $1 per month for each year of teaching experience" and it designates such payments as an "additional benefit" and an "additional annuity." The benefits and annuities to which these are additional are those provided by other sections of ch. 42, Stats. By sec. 42.42 every contract of employment as a teacher made after July 8, 1921, is subject to the provisions of the State Retirement Law (secs. 42.20 to 42.54), which confers specific benefits. Thereby such retirement benefits become part of the teaching contract and are consideration for the teachers' services; that is, compensation for them. Hence, "additional benefits" and "additional annuities" at first glance appear quite plainly to be additional compensation. Just as clearly, additional compensation is extra compensation;—that is, compensation outside of that previously agreed upon. Sec. 42.535 grants such benefits to certain teachers who retired before June 30, 1951. The new section became effective July 19, 1951. It is apparent, therefore, that this extra compensation is not granted until after the teaching contracts had not only been entered into but the teachers' services had been performed and the teacher had ceased to serve. If it be true, then, that the additional benefits and annuities form extra compensation, which was not granted until after the contracts were entered into or until the services had been rendered, the prohibition of sec. 26, art. IV, Const., renders the legislation void.

The petitioner submits, however, that this legislation is of a sort not forbidden by the constitution, for several reasons, which are not necessarily consistent with each other but any one of which will serve to sustain the legislation. First, he says, benefits provided by sec. 42.535, Stats., are

merely restoration or preservation of economic value of the compensation already granted, and he argues that the legislature by giving the retired teacher more dollars was, as nearly as possible, giving him only the equivalent of the fewer dollars which his contract promised: Hence there is no extra or additional compensation. Unfortunately for this contention, it has long been established that the compensation is governed by the contract's terms. The purpose of sec. 26, art. IV, Const., said Chief Justice RYAN in *Carpenter v. State* (1876), 39 Wis. 271, 285, is to limit contractors with the state to the precise compensation fixed by their contracts. The teachers' contracts for retirement benefits were contracts with the state and the compensation provided therein may not thereafter be increased by the legislature when the teaching is over. Their contract compensation was not expressed in purchasing power. Contracts can be so drawn and many of them are, whereby compensation is governed by a "cost of living" index or some other standard. The instant contracts, however, did not demand performance by the state in terms of goods, wares, or merchandise. Compensation was expressed in dollars, and additional dollars are extra compensation, which the constitution forbids the legislature to grant.

The petitioner then suggests that the additional benefits need not be regarded as compensation at all and are not payments made upon any contract, but on the contrary they are gratuities given former teachers by a sympathetic state, genuinely concerned over their economic plight, for the purpose of encouraging third persons to enter the profession and those now in it to stay in. A number of questions present themselves affecting this hypothesis. We find no declaration by the legislature that it had any such purpose in mind nor is there anything in the legislation to indicate that the economic plight of persons who are eligible for the benefits under the petitioner's interpretation of eligibility differs from that of

other teachers who were not included. The legislation itself, by requiring the return of deposits already withdrawn plus $100 per person indicates, rather, a lack of concern for the most destitute, when it extends its benefits only to those with some resources of cash or credit. Then, too, a purpose to retain or attract those whom the legislature wishes to have as teachers can hardly be read into an act for whose benefits such desirable teachers are not and cannot become eligible, and which tenders its advantages only to sixteen hundred thirty-five retired teachers (petitioner's estimate of the number who are both theoretically and practically eligible) whom it does not expect or wish to attract. This alleged purpose of the legislation is the more doubtful when if it existed, it could obviously be easily, effectively, and directly served by similar inducements made to the prospective, desirable, teachers themselves. In this connection petitioner relies on *State ex rel. Dudgeon v. Levitan* (1923), 181 Wis. 326, 193 N. W. 499, in which we sustained the constitutionality of the 1921 Teachers' Retirement Law and held that in establishing a pension system the legislature might constitutionally give pension credits for former teaching service. There was no element in that case of granting benefits to anyone whose teaching service was over, nor from the language used by the court can we infer that the court would have considered such a provision constitutional. The opinion repeatedly stresses the fact that the prior-service credits are allowed only to teachers then active with the purpose of inducing them, not others, to continue in service. The reward was held out to the very persons whom the legislature hoped to induce to perform future service, which is directly the opposite of the present fact situation. It may even be argued that the emphasis placed upon the current and future services to be expected from the beneficiaries makes the *Dudgeon Case, supra,* authority for the proposition that benefits for past service are unconstitutional when no current or future

services are to be rendered. We cannot treat the case as going that far because that question was not before the court, the legislature not having attempted to include as beneficiaries those whose services were finished, but at least *State ex rel. Dudgeon v. Levitan, supra,* is not authority for petitioner's proposition that the effort to give gratuities or bonuses to ex-teachers is constitutional because, supposedly, it benefits the educational system.

The petitioner also relies on *State ex rel. Atwood v. Johnson* (1919), 170 Wis. 251, 176 N. W. 224, in which the constitutionality of the Soldiers' Educational Bonus Law was upheld. Petitioner submits that benefits paid in gratitude for past services to the state are for a proper public purpose,—an encouragement to others to go and do likewise,—and do not constitute extra compensation within the contemplation of sec. 26, art. IV, Const. He reinforces this argument by *Brodhead v. Milwaukee* (1865), 19 Wis. *624, in which expenditure of public funds as bounties to induce men to volunteer for military service was upheld. The benefits in the *Brodhead Case, supra,* as in the *Dudgeon Case, supra,* and as absent in the case at bar, were payable to those who were serving and to those who would serve in the future but, in another respect, we regard both the *Atwood* and the *Brodhead Cases, supra,* as having a common element which distinguishes them from all others, to wit: That the beneficiaries performed military service in time of war. That, alone, is of such paramount public importance that men may be, and are, conscripted to serve, often at the sacrifice of their lives. The difference between the service of the soldier, whether conscript or volunteer, and that of the civilian public servant is so great that it becomes a difference in kind, historically recognized, not merely one of degree. Precedents approving as constitutional pensions or bonuses for veterans do not carry over as authority for like rewards to civilians.

The Cash Bonus Law, sustained in this court by *State ex rel. Atwood v. Johnson* (1919), 170 Wis. 218, 230, 175 N. W. 589, expressly stated that it was " 'a token of appreciation of the character and spirit of their patriotic service, and to perpetuate such appreciation as a part of the history of Wisconsin.' " The Educational Bonus Law, *State ex rel. Atwood v. Johnson* (1919), 170 Wis. 251, 176 N. W. 224, did not so declare its purpose but it was a companion law to the Cash Bonus Act and Mr. Chief Justice VINJE, at page 255, stated that the same purpose could be derived from the act itself, supplemented by contemporary history. Sec. 42.535, Stats., lacks any such declaration of purpose and we can read none into it either from the language of the section nor any contemporary history corresponding to that which, following the armistice of 1918, produced the soldiers' bonus legislation. But even if there was a preamble to the section in question, or language in its body declaring similar gratitude toward retired teachers, we would be unable to find that such an expression cleared away the difficulties and established a gratuity to them as a public purpose justifying the expenditure of public funds. Noble and useful as the profession of teaching in the public schools and institutions of higher education may be, as much may be said for most other forms of service to the public. If such a declaration by the legislature is sufficient to support, as an expenditure for a public purpose, a bonus for former teachers and an inducement to bring successors into this field of public service, we see no way to exclude from similar benefits any individual or group of individuals who have performed public service at least as fundamental to the survival of government and as essential to public welfare as the teaching profession. If gratitude for past services and a concern for the future of former teachers will validate the constitutionality of legislation granting bonuses

to them when their services have been rendered and their contracts not only entered into but on their part fully executed, so must the same considerations support and require judicial approval of whatever, for the same declared purpose, the legislature sees fit to confer on any other person who has labored in the public interest. If an alleged public purpose justifies such legislation today in behalf of one person because once he was a teacher, it must tomorrow equally justify similar legislation in behalf of another because once he served as an executive or administrative officer, a legislator, or judge. If the former teacher can constitutionally be voted a gratuity by a grateful state to encourage others to take similar employment and perpetuate a public function, a former governor may receive belated financial recognition for the same reason and so may the former employees of our sanitary systems without whose labors teachers, governors, and the rest of us would die of the plague. And if the veterans' bonus legislation is to be a precedent, it would not be necessary that the beneficiaries should even have been employed by some arm of the state of Wisconsin, since the veterans were not. Under this theory there is literally no constitutional limit to the persons eligible to receive public funds nor the amounts which they may receive. It would only require the legislature's express or implied belief that a public purpose is to be served, and that the means are adapted to that end, to validate a grant from the public treasury. The express prohibition of sec. 26, art. IV, Const., does not yield to such a concept nor do the military-bonus cases of *State ex rel. Atwood v. Johnson, supra,* and *Brodhead v. Milwaukee, supra,* require it.

The petitioner also submits that the "extra compensation" provision of the constitution does not apply to the present transaction because a new contract has been entered into, or an old one modified, whereby, in return for the repayment of moneys previously withdrawn, plus $100, the state now con-

tracts to pay the retired teacher a lifetime annuity at the rate of $1 per month for each year of teaching experience. A somewhat similar device was sustained by the supreme court of Illinois against the charge that it conflicted with a constitutional provision essentially like our own. *Raines v. Board of Trustees Pension Fund* (1937), 365 Ill. 610, 7 N. E. (2d) 489; *Ridgley v. Board of Trustees* (1939), 371 Ill. 409, 21 N. E. (2d) 286; *Krebs v. Board of Trustees of Teachers' Retirement System* (1951), 410 Ill. 435, 102 N. E. (2d) 321. Because the Illinois retirement law made deductions from the teacher's salary optional with the teachers, the Illinois court concluded that the fund in which they were deposited was not a public fund and, as the constitution prohibited extra compensation out of public funds, only, the prohibition did not apply to payments from funds which were not public. Whether the Illinois court would have reached the same result if the deductions from salaries had been compulsory we cannot say. It did stress the voluntary character of the deductions and the separate fund in which they were deposited, whereas the deductions from teachers' salaries are compulsory under Wisconsin law.

The funds into which Wisconsin teachers' salary deductions are paid is the retirement deposit fund, to which the state also makes a contribution determined by law. This is comparable to the single fund which, in Illinois, receives all contributions and makes all disbursements. The retirement deposit fund is unable, even without the demands of sec. 42.535, Stats., to meet the drafts upon it and the assets of the contingent fund must be drawn upon. This is a fund set up as a sort of shock absorber and out of which the annuities are paid. Into this fund each year the state pays an amount calculated according to the present value of the fund's liabilities. The state gets the money to make payments to the contingent fund from the general fund, into which all income-tax collections go, including the proceeds of the teachers'

retirement surtax. The $100, which each teacher is to pay in order to become eligible for the benefits of the section, is also paid by such teacher into the general fund, per sec. 42.535. Among all the contentions which have been made in this action it has not been asserted that the general fund is not a public fund. The progress of the money which pays the controversial additional annuity is from the general fund, to the contingent fund, to the annuity reserve fund, to the retired teacher. Each of these transfers is said to be for a public purpose but somewhere under the three shells it is asserted that the little pea has shed its public character and become private and, as such, acquired freedom from the restraints of sec. 26, art. IV, Const. We yield to no one in our realization of the intricacies of governmental finance and our admiration of the man who understands it, but we confess inability to follow the taxpayer's dollar from the general fund through the others, each transfer being to effect a public purpose, and arrive at a conclusion that before it gets into the hands of the teacher it has somehow ceased to be public money. To be sure, the constitutional prohibition does not distinguish between public and nonpublic funds. If the time comes when the legislature awards extra compensation payable out of funds which are not public we may have to construe the Article with that in mind, but that question is not presented here. We conclude that the present benefits are payable from public funds and, as the Illinois court held their fund was not a public one, the Illinois cases are not persuasive authority.

The petitioner suggests that the legislation may be sustained as a contract, with no involvements concerning past services or extra compensation, because the state is agreeing to provide a new annuity for a new consideration,—the payment of $100 into the general fund. It appears to us that if the factor of past services and compensation therefor is withdrawn, we have nothing left but a group of people in whom

the legislature has become interested and to whom it is willing to sell a life annuity. When the applicants rest their claims on their former service they are entangled with sec. 26, art. IV, Const. When they free themselves from that by relying only upon the new consideration to support a new contract they put themselves into the class of other private citizens, with former teaching status as an identifying mark only, and the special benefit granted them is a use of public funds for a private interest and, hence, unconstitutional. *State ex rel. Smith v. Annuity & Pension Board* (1942), 241 Wis. 625, 6 N. W. (2d) 676; *Attorney General v. Eau Claire* (1875), 37 Wis. 400, 436.

The petitioner further submits that the statesmen who drew sec. 26, art. IV, Const., did not have retirement systems in mind and we would pervert their intent if we applied that Article to a retirement or bonus plan for state employees. He argues that it was contracts for other purposes which the constitution intended to circumscribe. We cannot agree with the reasoning or the conclusion. Conceding that retirement plans, as distinguished from pensions, were not, in 1848, customary ways of spreading the employees' compensation over a greater number of years, the framers were well aware that public servants, including teachers, were employed for compensation accepted or agreed upon by express or implied contract and that an agreement to render personal service for a consideration is a contract equally with one for the furnishing of materials or accomplishing some specific result. They knew the meaning of every word in the Article and the meanings have not changed with the passage of time. "Services," "contracts," and "compensation" are not new terms or new concepts. The language of the Article admits of no doubt that it was the intent of the draftsmen who prepared it and the electors who adopted it that, when a person rendered public service for compensation agreed upon, his right to compensation depended upon and was limited by his agreement. "The exact measure of his right is deter-

mined absolutely by his contract, under the constitution; and there exists nowhere a discretion to vary it." *Carpenter v. State* (1876), 39 Wis. 271, 283. Why should it be thought that if the constitutional conventions of 1846 and 1848 *had* been mindful of the deferred and diffused compensation of retirement systems they would have taken such contracts out of the prohibition which they thought wise to impose regarding compensation and contracts generally? Nothing in the language of the constitution suggests such a possibility to us and we are not able to rest a decision on the surmise that it might be so.

It has not escaped the attention of the court that a decision sustaining an increase of benefits for already retired teachers would clear the way for legislation increasing benefits for all public employees, including judges, granted by the legislature from time to time after their retirement, and such a decision would be consonant with the selfish interests of the court. Nevertheless, as we read sec. 26, art. IV, Const., this would involve an exception to a clear and unmistakable command. If exceptions are to be made, they should not come from the legislature or the court but from those whose proper function it is to amend the constitution. When the people determined that the times required state participation in the construction of highways, airports, veterans' housing, and the preservation and development of forests, they adopted amendments to the constitution excepting these interests from the terms of sec. 10, art. VIII, which forbade the state to engage in works of internal improvement. If, now, to underwrite certain contracts against the effects of inflation is deemed, by the people, to be desirable, or if they consider that the cause of public service requires power in the legislature to grant bonuses, apart from compensation, to retired public servants, the road to amending the constitution is well traveled, and in such an amendment guides and limits to legislative and judicial authority can be set in such wise

as the people consider best meets the problem to be dealt with and provides safeguards against abuse.

With regret that we are not persuaded by petitioner's arguments and authorities, we conclude that the effect of sec. 42.535, Stats., is to grant extra compensation to public servants after the services are rendered and to public contractors after the contracts are entered into, in violation of sec. 26, art. IV of the state constitution. We find it unnecessary to our decision to determine whether there is unconstitutional discrimination in limiting the benefits of sec. 42.535, Stats., to those teachers who had retired before June 30, 1951, and who, on that date, were either actually receiving retirement benefits or had applied for them. For the same reason we need not explore the question of whether or not the obligation to pay additional benefits would create a state debt in violation of sec. 4, art. VIII, Const. Sec. 42.535, Stats., conflicts with sec. 26, art. IV, Const. We must, therefore, hold it void.

We wish to express our appreciation to all counsel for unusually able and informative briefs and argument.

*By the Court.*—Alternative writ of mandamus quashed. Petition for a peremptory writ of mandamus denied.

CURRIE, J. (*dissenting*). This court in *State ex rel. Dudgeon v. Levitan* (1923), 181 Wis. 326, 193 N. W. 499, held that the provisions of the Teachers' Retirement Act, which provided for granting past-service credits in computing the pension of a teacher still in service at the time of the enactment of the act, was not a grant of extra compensation for services already rendered by such teacher, contrary to sec. 26, art. IV of the Wisconsin constitution. Twenty-nine years have now elapsed since that decision, during which period we have not only witnessed a great growth in retirement systems for both public servants and employees in private industry, but we have seen how inflation has intervened

to render nugatory to a large measure one of the chief objectives of our teachers' retirement system, viz., that retired teachers who have devoted the best years of their lives to the noble profession of teaching might be enabled to live in self-respect in their old age on their retirement annuities rather than be the objects of public charity.

In my opinion the time has come when this court should take one further forward step in the direction in which the decision in *State ex rel. Dudgeon v. Levitan, supra,* pointed, and declare that sec. 26, art. IV of the constitution, has no application to pension or annuity benefit pay to retired public servants pursuant to a genuine retirement system embodying an otherwise valid statute or ordinance serving a public purpose.

To hold, as the majority opinion does, that the state is powerless to increase retirement benefits to retired public servants in an attempt to restore the adequacy of such benefits seriously impaired by inflation, is to place all retirement systems for public servants in a strait jacket, thus rendering it impossible that such retirement benefits shall serve the original purpose intended.

The framers of our state constitution never intended sec. 26, art. IV, Const., to apply to retirement benefits paid to retired public servants under a validly enacted retirement system whereby such benefits might be paid over a long period of time, after all service to the state or municipality has ended. The provisions of sec. 26, art. IV, were included in the 1846 constitution (sec. 5, art. VI thereof), which constitution was rejected by the electors on other grounds, and when the 1848 constitutional convention met, the same provisions were inserted in the new 1848 constitution without debate. At the time of the writing of our state constitution, there was no retirement plan in effect for the employees of any state or municipality in the nation. According to an article entitled "Retirement Systems and Morale in Public

Service" appearing in 113 Annals of the American Academy of Political and Social Science, 338, the first retirement system for public employees in the United States of which a record is available is a New York City pension fund for policemen established in 1857. Massachusetts was the pioneer in the establishment of a state-wide system, having enacted its law in 1911, which is the same year in which the first teach-ers' pension plan was adopted in this state (ch. 323, Laws of 1911). Thus the framers of our constitution could not have had a public retirement system in mind when the provisions of sec. 26, art. IV, were inserted in the constitution.

What evils did the framers seek to prevent by the language employed in sec. 26, art. IV, Const.?

Following the 1846 state constitutional convention, and while such constitution was before the electors of the state for consideration prior to the date set for the election to ratify or reject the same, the Racine Advocate ran a series of articles explaining the various provisions of the constitution. In article No. 6 of the series, published March 3, 1847 ("The Struggle over Ratification 1846–1847" by M. M. Quaife, at page 480), appeared an exposition of the provisions of the 1846 constitution which is the exact counterpart of sec. 26, art. IV of the 1848 constitution, in which article it was stated:

"We will now point out some of the most important restrictions of the powers of the legislature. By this article it is provided that 'the legislature shall never grant extra compensation to any public officer, agent, servant, or contractor after the service shall have been rendered or the contract entered into.' A vast reform as all who understand anything of all the corrupt and corrupting influences and maneuvers of extra allowances will at once comprehend. A vast reform, indeed, full of the deep philosophy of the Lord's prayer as applicable to legislators in their official as in their personal relations—'lead us not into temptation.' This one section, full of purifying reform against an abuse which besets

all legislatures and corrupts so many, is worth all the evils alleged against this constitution. Ponder well upon it; it will brighten to the eyes of every intelligent freeman the longer he reflects upon it."

A number of constitutions of other states contain provisions very similar in wording to sec. 26, art. IV of the Wisconsin constitution. See "Federal and State Constitutions of the United States" by Frederic Jesup Stimson, p. 208, sec. 214, and footnote 4. In checking the journals and recorded debates of the constitutional conventions of these other states which have adopted like provisions against prohibiting extra compensation after the contract or service has been performed, one finds practically no recorded discussions of the reasons underlying the adoption of such provisions. One notable exception is that of the constitutional convention of Utah held in 1895. In the "Official Report of the Proceedings and Debates of the Utah Convention," pages 890 to 894, the following enlightening debate took place with respect to inserting such a provision in the Utah constitution:

"Mr. Richards. Mr. Chairman, I move that section 4 be added to the legislative article. I desire to say, Mr. Chairman, to the gentlemen of the committee that this section does not in my opinion partake of a partisan character, and perhaps there may be gentlemen enough on this floor, who would be willing to support it. The object of this will be clear to gentlemen who will stop and consider it for a moment. It is to prevent people who are in power in any department of the state occupying public positions from letting contracts, at low figures and then afterwards increasing the amount of compensation in this way: A man who is a favorite with a county court or a city council or with any other public officer, who might have it in his power to let public contracts, might come in and underbid all *bona fide* bidders for this work and get the contract, with the understanding afterwards that if the work cost him more, he would be reimbursed by the county or by the city as the case might be. This is an evil that has occurred a great many

times in different places as you are all aware if you have given this matter any consideration, and the object of this is to prevent that sort of thing and to compel *bona fide* transactions in the letting of public contracts. Also if any unauthorized agreement is made, as for example, to prevent an officer of a city or a county or of the state who has no authority in law from going out and letting contracts to some favorite, when if the contract was let in the regular way the public would have an opportunity to bid—declaring that such contracts would not be valid and could not be enforced. And I say, I do not see, and I do not believe that there is anything in this section of a partisan character. Whether it is such a section as you gentlemen approve of, or not, of course remains to be seen by the vote, but it seemed to the minority of the committee that it would be a proper provision to insert in the constitution. It appears in the constitutions of other states. I think that this particular provision is taken from the constitution of the state of Missouri. . . .

"Mr. Button. I would like to ask a question. Under this clause, last year, when the governor ordered the deputy sheriffs out here when the commonweal army came through, could the sheriff collect pay for those deputies he swore in under this clause?

"Mr. Richards. I think so; I do not think this has any reference to that at all. There was service that he was performing that he would be entitled to pay for; but this is intended to cover a case where a person has undertaken to do a certain thing, either as a public officer, in the performance of his public duty, or as a contractor, under contract; he has undertaken to do a certain thing, and do it for a certain sum. Now, this is intended to prevent the granting of any additional sum afterwards, and the reason for it is just as stated in the illustration I made. If men would always bid honestly they would probably all get a fair compensation for their work.

"Mr. Button. So far as that goes, I think it is right.

"Mr. Richards. Why should not the same thing apply to a public officer? For example, should the county court or city council appoint a man to perform a certain public duty—that is, the office is created by ordinance or by statute, the duties of the office are defined, the man is elected or appointed to

that position. He enters upon the duties of the office, he agrees to perform his duties, and after his term has expired or after a certain period has expired and the work has been done, they come in and pay him more than his salary or than was provided by law for him to receive for this service. That is not right, and it is just to prevent those things that this section is proposed."

From the foregoing quotations from the March 3, 1847, Racine Advocate, and the debates of the Utah convention, it appears that the evil, which the provision of sec. 26, art. IV, Const., was aimed to prevent, was that of a type of corruption which resulted from some favored contractor making a low bid for some public work in connivance with the governing body or legislature of the municipality or state for whom the work was to be undertaken, and then having extra compensation thereafter voted to such contractor. Along the same line it was felt to be morally wrong for a man to accept an elective or appointive political office at a certain fixed salary and then, thereafter, either during the term of office or after the service had been rendered, to have extra salary voted. It was felt that a public officer stood in a parallel position with a public contractor, and having contracted to perform a certain service for a fixed sum, he should be bound by his contract.

In *Gubler v. Utah State Teachers' Retirement Board* (1948), 113 Utah, 188, 192 Pac. (2d) 580, the Utah court upheld a prior-service-credit provision of its Teachers' Retirement Act against a claim that it violated a provision of the Utah constitution similar in wording to sec. 26, art. IV of our constitution. In the concurring opinion by Mr. Justice WOLFE in that case he declared (p. 204) :

"I concur. I might add that I do not think that article VI, section 30 of the constitution of Utah was intended to prevent retirement plans for public officers or employees. While its language is broad, its intent was to prevent the acceptance of a low bid from a favored contractor and a subsequent

increase of his emoluments by additional later payments. This was one device by which contractor city machines had been built up in eastern cities at the time our constitution was being drafted. As to public officers, agents, and servants, it was to prevent extra pay above that contracted for in the case of the public agent or servant, or above the statutory salary which becomes part of the employment contract upon the election or appointment of the public officer."

Annuities and pensions paid under a public retirement system are so far removed from the type of compensation which the framers of the constitution had in mind in barring public officers from receiving after their terms of office had expired that the provisions of sec. 26, art. IV of the constitution should not be construed to apply to such benefits or to an increase in the same.

The majority opinion declares there is no distinction between the case where a legislature attempts to vote additional compensation to some public officeholder, such as a governor or judge, after the expiration of his term of office in gratitude for the service rendered, and the present case of increasing the retirement benefits of a teacher after her retirement. A careful analysis of the two cases will disclose that they are poles apart. In the former case, the public officer is similar to the contractor who has agreed to perform a public contract for a definite price, as the officer has agreed that so long as he serves in the current term of such office he is to receive as his remuneration therefor the established salary of such office applicable to such term. Any additional money voted to him after such term is intended to further compensate him for such past services and therefore is directly in conflict with sec. 26, art. IV of the constitution. On the other hand, increasing retirement benefits under a validly established public retirement system to a retired public servant, such as the teachers in this case, is not done for the purpose of granting additional compensation for the past services performed, but to make adequate the retirement

benefits which were being paid to the retired annuitant at the time he or she ended public employment, and which retirement benefits were to extend throughout the annuitant's remaining life.

There is one further marked point of distinction between the two cases. In the case of the public officer who finds that he cannot adequately live on the salary of his office due to inflation occurring during his term, or other causes, he has the privilege of resigning and accepting other better paid employment. Not so the retired teacher! Her retirement benefits are intended to provide for her during her declining years, and in 'many cases she has no option then available to her to seek other employment because her earning power is already gone as a result of the infirmities of advancing age. Such a teacher may have given forty or fifty years of life to devoted public service, and have been persuaded to stay in the teaching profession under the inducement that her retirement benefits would adequately provide for her old age when she was no longer able to work, only to now find that inflation has in reality cut the true value of such retirement pay in half. The legislature recognized the moral responsibility of the state to remedy the situation and enacted the statute now under consideration, but the majority opinion, oblivious to the fact that the increased retirement benefits so voted were not intended as compensation for past services, but instead were for the purpose of making the teachers' retirement benefits adequate so that the system would accomplish its original objective of the retirement system, declares the act void.

The objective of our teachers' retirement system was eloquently stated by Mr. Justice OWEN in his opinion in *State ex rel. Dudgeon v. Levitan, supra* (p. 330):

"As a phase of that broader social philosophy which has come to demand that an employee who has given the services of a lifetime to an employer be provided for in his old age,

public thought has crystallized upon the idea that teachers who render society service of the highest order shall not wear themselves out and be summarily dismissed from the service without something in the nature of a provision for the support of themselves and their dependents. It is recognized that this protection should be more definite and dignified than that of common charity. This belief finds expression in so-called teachers' pension laws providing a fund created by the contributions of the teacher and the state."

Mr. Justice OWEN further flatly stated in his opinion in *State ex rel. Dudgeon v. Levitan, supra* (p. 343):

"As we view it, the annuity based on past service is not intended to be, or operate as, compensation for past service. It was rather intended to be, and in fact is, an inducement to the seasoned and experienced teacher to remain in the service and give the public the benefit of his experience."

The majority opinion in the instant case denies that increasing benefits of teachers already retired can be an effective means to induce other teachers still in service to remain in the teaching profession, and states that the proper way to induce teachers still in service to remain in the profession is to increase their own retirement benefits. Teachers, as well as citizens in all other walks of life, are today keenly aware of the problems imposed by our present inflation. It is difficult to believe that the present statute, if permitted to be carried out, whereby the state recognizes its moral responsibility to protect retired teachers from the adverse effect on their retirement pay caused by inroads of inflation, would not have some beneficial effect to induce teachers to stay in the profession. On the other hand, can it be doubted that the effect of the majority decision in this case will not be to adversely affect teachers remaining in the profession as the result of their realizing that the state is powerless to· do anything to protect their retirement benefits from inflation once their status is changed by their own retirement? In

any event, it is for the legislature, and not this court, to determine the means to be adopted in so altering the retirement system as to accomplish the objective of inducing teachers to remain in the profession.

In conclusion, to summarize the arguments previously advanced herein, it is my opinion that the act before us does not violate the provisions of sec. 26, art. IV of the constitution because:

(1) The framers of the constitution could never have intended such provision to apply to retirement benefits being paid to a public servant after he retires from public service.

(2) The increasing of retirement benefits to retired teachers was not voted as additional compensation for services already rendered, but to make their retirement pay adequate which had been rendered inadequate by inflation, thus insuring that the original objective of the Teachers' Retirement Act would be carried out.

(3) Strongest reasons of sound public policy require that sec. 26, art. IV, Const., be construed as having no application to retirement benefits paid to retired public servants pursuant to a genuine retirement system validly enacted for public purposes.

I am authorized to state that Mr. Justice FAIRCHILD joins in this dissent.