## Jameson *v.* Pittsburgh, Appellant.

Argued November 12, 1954. Before STERN, C. J., STEARNE, JONES, BELL, CHIDSEY, MUSMANNO and ARNOLD, JJ.

*J. Frank McKenna, Jr.,* City Solicitor, with him *David Stahl,* Assistant City Solicitor and *Nicholas R. Stone,* Solicitor for Pension Board, for appellants.

*John A. Metz, Jr.,* with him *Metz & Metz,* for intervening appellants.

*Paul R. Obert,* for appellee.

*Elder W. Marshall,* with him *Carl E. Glock, Jr.* and *Reed, Smith, Shaw & McClay,* as amicus curiae.

OPINION BY MR. JUSTICE ARNOLD, April 18, 1955:

In this action in equity defendants appeal from the order of the court below refusing their motion for judgment on the pleadings. Involved is the constitutionality of the Act of 1953, P. L. 1255, 53 PS §9414

(d).[1] Plaintiff-taxpayer of the city of Pittsburgh seeks to enjoin defendants "from taking any action pursuant to the term of said statute," contending that it violates Article III, Section 11 of the Pennsylvania Constitution.[2] The court below refused defendants' motion, holding that the Act violates Article III, Section 7,[3] and Article III, Section 11, of the Constitution.

The Act, in subsection (d) provides:

"The pension board of any city of the second class is hereby authorized to establish a program whereby any beneficiary under the pension fund, upon payment into the fund of the sum of two hundred dollars . . ., shall be entitled to receive from the fund, annually and for life, in addition to his regular pension as determined as of the date of his retirement from service . . . an additional annuity, . . . sufficient in amount so that the total monthly payments received by him for regular pension and additional annuity combined shall equal the amount of the regular pension which he would have been entitled to receive if he had retired from service in the city and as of August 1, 1953, and having earned for the past five (5) years the average rate of pay received during the last five (5) years of his actual employment . . ."

Defendants and intervenors contend that the voluntary contribution of $200 by the pensioner in return

---

[1] This case is also determinative of the Act of 1953, P. L. 978, 53 PS §8475.1, and the Act of 1953, P. L. 1003, 53 PS §9457.1, which are substantially the same as the above Act and effect the Firemen's Pension Board and the Policemen's Pension Board. Both of these groups were granted leave to intervene in the present action.

[2] "No bill shall be passed giving any extra compensation to any public . . . employe, . . . after services shall have been rendered . . ."

[3] "The General Assembly shall not pass any local or special law: . . . Granting to any . . . individual any special or exclusive privilege . . ."

for the annuity creates a contractual relation between him and the pension board, and is not "extra compensation" prohibited by the Constitution; that the cash contribution coupled with the "moral obligation" on the part of the governing body to provide adequate allowances to pensioners constitute valid consideration for the increased annuities.

We have heretofore held that "as of the time he joined the fund, his [the pensioner's] right to continued membership therein, under the same rules and regulations existing at the time of his employment, was complete and vested": *Baker v. Retirement Board of Allegheny County*, 374 Pa. 165, 169, 97 A. 2d 231. The same rule applies to the other of the contracting parties—the governing body. In *Koehnlein v. Allegheny County Employees' Retirement System*, 373 Pa. 535, 97 A. 2d 88, we held that the Act amending the retirement system so as to increase retirement allowances to an employe retired before passage of the Act was unconstitutional under Article III, Section 11. We there said, at pages 538, 542 and 543: "By section 322 of The General County Law [16 PS §312] . . . the retirement allowance was fixed in terms of dollars and not purchasing power. There is nothing in the provisions governing the county's retirement system to justify a retirement allowance based on earned compensation adjusted to a 'cost of living' index or other standard related to the buying power of money . . . The constitutional inhibition against legislative augmentation of municipal pensions or retirement allowances after an employe has been retired is the same as it is with respect to the original granting of a pension or retirement allowance . . . The plight of retired municipal employees because of the inadequacy of their retirement allowances in relation to the increased cost of living, particularly in the past few years, is regrettable to say

the least. But, *sympathy for their distress affords no justification for ignoring established constitutional restraints.* If legislative inroads upon retirement funds by way of gratuitous disbursements therefrom were to be tolerated, it would not be long before retirement systems in general would be imperiled, if not destroyed, to the detriment not only of the retired employees intended to be benefited by the unconstitutionally increased retirement allowances but also of the current contributors to retirement funds who are still in the service of the municipality . . . *The very arbitrariness of the amendatory Act here under consideration precludes any thought that it was enacted in an exercise of the legislature's power to 'render intact the actuarial soundness of the system so as to strengthen its fibers'* . . . Retirement Board v. McGovern (316 Pa. 161, 176, 174 A. 400) . . ." (Italics supplied). Thus, any "moral obligation" alone has been determined by us to be insufficient to sustain the right to change the retirement allowances.

Does the voluntary contribution of $200 remove this Act from the constitutional inhibition? We think not. The same problems still exist as were pointed to in *Koehnlein v. Allegheny County Employees' Retirement System,* supra. The increased pension—though termed an "annuity"—is still a "gratuitous disbursement" from the fund, to which the pensioner was not entitled when "he joined the fund."

Appellants cite *Hickey v. Pittsburgh Pension Board,* 378 Pa. 300, 106 A. 2d 233, as authority for their position. This upon the following quotation from the opinion in that case, at page 311: "The plaintiff is also entitled to such amounts as may be due him by the amending Acts of 1951, P. L. 1091 and 1952, P. L.

2110, with regard to cost of living increases, as claimed in Paragraph 9 of his Complaint." But their constitutionality was neither raised nor passed upon. This being so, the statement depended upon cannot be used as authority in the instant case—where the matter is specifically raised. The *Hickey* case turned solely on the question whether or not the plaintiff's pension rights had become vested and whether, if vested, they could be altered or destroyed thereafter by legislative enactment. We did not intend in any way, in the *Hickey* case, to deviate from the policy and rules laid down in the *Koehnlein* case. Further in the *Hickey* case, we declared at pages 309, 310: *"The Legislature may strengthen the actuarial fibers but it cannot break the bonds of contractual obligations. The permissible changes, amendments and alterations provided for by the Legislature can apply only to conditions in the future, and never to the past.* According to the cardinal principle of justice and fair dealings between government and man, . . . the parties shall know prior to entering into a business relationship the conditions which shall govern that relationship . . . The impairment of contractual obligations by the Legislature is . . . abhorrent because such impairment changes the blueprint of a bridge construction when the spans are half way across the stream . . . Thomas Hickey is entitled to be paid according to the contract of 1915 [pension rights as established by the Act of 1915, P. L. 596, 53 PS Section 9411]." (Italics supplied)

Further, in the *Koehnlein* case, we cited and quoted with approval from *State ex rel. Thomson v. Giessel*, 262 Wis. 51, 53 N. W. 2d 726. The Wisconsin Supreme Court was there confronted with the same problem, including a like constitutional inhibition against "extra compensation," as is present in the instant case. That

Court determined, and we think rightly so, that despite the payments intended to be made by the petitioner, such an increase in the pension payments should be made not by the Legislature, but by constitutional amendment, if it is to be had at all.

We hold that the instant Acts are violative of Article III, Section 11, of the Pennsylvania Constitution as to the employes retired at the time of the passage of the Act. It is unnecessary to consider whether or not they are also a violation of Article III, Section 7, or any other section of the Constitution.

Order affirmed, costs to abide the event.

―――――

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

The retirement system in Pennsylvania for its public employes is now as much an integral part of the Commonwealth as the capitol, the government buildings and the highways which, like arteries, supply life blood to the economic, social and political body of the State. The object of retirement with pay is to obtain the very best services of which an employe is capable by banishing from his mind worries as to his economic future. Through contributions made by the employe and appropriation made by the State, the employe is assured that when his most productive services have passed, he will have an income which will take care of his living needs and he will not need to blanch before the prospect of helplessness if sickness stands unbidden at the door or calamity looks in at the window. In *Retirement Board v. McGovern,* 316 Pa. 161, 164, Justice KEPHART, speaking for a unanimous Court, well put it when he said: "The merit of this system cannot be doubted: persons reaching a given age who have been

long in the service of the government, an age at which no other useful employment is open to them, should be protected and cared for by the governmental agency in whose behalf they have so long labored."

While pension legislation is generally regarded as social legislation, it is by no means strictly philanthropic from the viewpoint of the State. The relationship between the State and the employe is a contractual one with each side enjoying benefits and each side having obligations to discharge and duties to perform. In *Hickey v. Pittsburgh Pension Board,* 378 Pa. 300, we made this clear with the statement: ". . . the pension of today is not a grant of the Republic nor in this case is it a gift of the City Fathers. It is the product of mutual promises between the pensioning authority and the pensioner; it is the result of contributions into a fund which exists for the single purpose of pensions."

In *Busser v. Snyder,* 282 Pa. 440, we said: ". . . the basis on which these acts are founded is neither charitable nor benevolent; they are founded on faithful, valuable services actually rendered to the Commonwealth over a long period of years, under a system of classification which the legislature has considered reasonable. These appropriations are for delayed compensation for these years of continued service actually given in the performance of public duties in their respective capacities, with the quality of right and obligation in its concept. It is compensation for the hazard of long continued public employment."

For the number of years required by law the retired city employes, policemen and firemen whose pension status is involved in this litigation made certain payments into their respective pension funds and looked forward to that care and protection which the

State assured them would be theirs when they would have terminated their long and faithful stewardship. It was assumed during all the time that the employes made their contributions that upon retirement they would receive a pension reasonably adequate to meet elemental living needs. However, after the employes had been retired, the American dollar, because of the extraordinary ever-increasing high cost of living, so diminished in value that the pensioners found themselves receiving an amount quite insufficient to discharge those obligations which could have been conveniently met had there been no change in the purchasing power of the amounts drawn to them in the periodical retirement check. It would be as idle as spilt-milk grieving to point out that $10 today cannot purchase what it could purchase five, ten and twenty years ago. The dollar bill of today, in point of purchasing power, has shrunken to the size of a cigar coupon in comparison to what it looked like in 1935. The legislature, like everybody else in the Commonwealth, has realized this state of reality and, in conscientious fulfillment of obligations owing to the retired public employes, it enacted in 1953 three laws (Acts 355, 239 and 252) which assured to retired city employes, firemen and policemen of the City of Pittsburgh, upon payment of $200 each, an annuity whose inherent value would measure up to the purchasing power of the dollar-pension* promised the employes when they entered into contractual relationship with the State.

The Court of Common Pleas of Allegheny County, on a taxpayer's suit inquiring into the constitutionality

---

* According to an article in the March 19, 1955 issue of the Magazine of Wall Street, the dollar today is worth 52.1 on the basis of a 1926 100-cent dollar. (Con. Record, March 25, 1955, p. A2112)

of the statutes, declared these statutes null and void. The Majority of this Court has affirmed the decision of the lower Court. I believe this to be error. Authoritative expressions of this Court on this subject during the last twenty years should of themselves have saved the three statutes from judicial veto. In *Retirement Board v. McGovern,* supra, this Court said: (p. 164) : "The enactment of retirement laws comes under the general power of the assembly to legislate on matters which are not interdicted by the Constitution. . . . *It is the sole judge as to laws that are in the interests of the public and have a tendency to procure for its people more competent and better performed public service.*"**

In *Haldeman v. Hillegass,* 335 Pa. 375, 385, this Court said: "This is in effect an acknowledgment by the legislature of prior service, and a recognition by it that long and faithful public employment should be compensated, emphasizing the purpose and scope of the provisions for retirement pay or delayed compensation."

In *Hickey v. Pittsburgh Pension Board,* 378 Pa. 300, we said: "The plaintiff is also entitled to such amounts as may be due him by the amending Acts of 1951, P. L. 1091 and 1952, P. L. 2110, *with regard to cost of living increases,* as claimed in Paragraph 9 of his Complaint."

The *Hickey* decision was rendered in June, 1954. Did we think more of the pensioner in the summer of 1954 than we do in the spring of 1955? If it was proper to authorize the payment of augmented retirement benefits last year on account of the high cost of living, what reason impels the withholding of those benefits this year? Has the dollar bill reacquired its pre-war vigor and size? If it has, it is not evident to this Opin-

---

** Italics throughout, mine.

ion writer. But the Majority says that the statement in the *Hickey* decision above quoted is not binding because in the *Hickey* case the constitutionality of the Amending Acts of 1951 and 1952, "was neither raised nor passed upon." To say that this Court orders payments to be made under certain statutes and then explain subsequently that when we ordered the payments we were not concerned with the constitutionality of those statutes is to ascribe to this Court an indifference to the fundamental law of the land which I do not believe the Majority should want to approve. The Constitution is always with us and it is our duty to place every disputed statute over the map of its delegated powers and inhibitions to see whether the statute fits into the geographical contours to which the subject assigns it. I believe that the Acts of 1951 and 1952 were accepted as constitutional in the *Hickey* case and that the three Acts of 1953 find appropriate lodgment within the confines of the organic law of 1874.

The Majority says that the three statutes offend against Article III, Section 11, of the Constitution which declares inter alia: "No bill shall be passed giving any extra compensation to any public . . . employee . . . after services shall have been rendered . . ." But the legislation before us for interpretation does not award *extra* compensation, it authorizes *adjusted* compensation. It is not disputed that the purpose of the retirement system is to assure the retired employe a reasonable living during his retirement period. Nor can it be disputed that the shortened dollar of today cannot reach the standard of living which the law intended for the pensioner. With this established discrepancy, therefore, between the purpose of retirement and what has actually occurred, it is inescapable that an obligation devolves upon the employer to fill the breach of the

resulting deficiency and to mend the impaired contract solemnly entered into. If the State had originally promised to settle upon its retired employes certain grants of land and then the land had become useless because of volcanic eruption, earthquake or tidal wave, it could not be urged that the government would not have an obligation to grant other usable land to those employes. If the State had agreed to pay its retired employes with the fruit of trees that later became sterile, it could not be said that the State could plead payment by pointing to the desolate orchard of empty and withered limbs.

It is argued against the legislation here being considered that the retired employes are receiving the monetary amounts promised them and, therefore, they have no legitimate complaint to register. But retirement pay which does not sustain one in retirement is a misnomer. When one speaks of bread, one does not envisage merely a crumb or a slice, but enough to keep body and soul together. The retirement payments of today, on the basis of a 1935 money standard, cannot hold the soul within an inadequately fed body. There thus devolves upon the government in this situation an obligation which it cannot morally shunt aside.

But in its Opinion the Majority mentions moral obligation only to discard it as if it were a subject of little import in this case. On the contrary, it is of paramount importance. In any country worthy of the respect of mankind, legal responsibility is but the executive agent of moral indebtedness. This Court has often decided cases on the basis of natural justice where a literal adherence to unyielding syllables spelled out words not synonymous with honesty in fair dealings between man and man and man and government. In the case of *Harbold v. Reading*, 355 Pa. 253, the ques-

tion arose as to whether this Court should give authority to a statute (Act of May 26, 1943, P. L. 660) which imposed on the City of Reading a liability for the payment of bonds which expressly declared that no liability existed. It was argued in that case that the Act of 1943 was unconstitutional because it offended against the same section of the Constitution which is involved here, the specific, pertinent prohibition reading: "No bill shall be passed giving any extra compensation to any . . . contractor after services shall have been rendered or contract made." This Court, however, speaking through Mr. Justice STERN (now Chief Justice), recognized the moral obligation devolving upon the City of Reading and, in decisive language, declared: *"Notwithstanding the constitutional provisions above quoted, it is well established in our own State, as well as generally elsewhere, that a claim supported by such a moral obligation and founded in equity and justice, even though not legally enforceable,* may be recognized by the legislature and made collectible either from the State itself or any of its political divisions; the legislature may compel municipalities to adopt and discharge such obligations and to exercise the power of taxation for that purpose." Applying the reasoning in that case to the question before us here, is it to be said that an obligation to a government's own employes is of less binding force than a city's obligations to a contractor? In that same *Harbold* case, Chief Justice STERN cites thirteen instances where this Court and the Superior Court approved of payments which were prohibited by constitutional or statutory provisions but which were imbedded in the solid rock of honest and moral obligation.

Another illustration of this character can be found in the case of *Bailey v. Philadelphia,* 167 Pa. 569,

where the Philadelphia City Council appropriated a certain sum of money to be paid to a school teacher for services rendered. This school teacher had already attempted to collect her wages through a lawsuit which was decided against her by this Court. When the matter came before us again via the dispute as to whether the City Council could justify an appropriation for the wages claimed, we held, speaking through Justice MITCHELL, that the law could not prohibit a City from recognizing a moral obligation. Said Justice MITCHELL: "Does the law prohibit the city from recognizing the moral obligation arising from these circumstances? We do not find anything that compels us to so hold. A moral obligation in law is defined as one 'which cannot be enforced by action but which is binding on the party who incurs it, in conscience and according to natural justice,' and again, a 'duty which would be enforceable by law, were it not for some positive rule, which, with a view to general benefit, exempts the party in that particular instance from legal liability . . .' 15 Am. & Eng. Ency. of Law, 716. In this state it is held that such an obligation will sustain an express promise to pay, and a fortiori, an actual payment . . ."

Justice MITCHELL said further: "Councils it is true are trustees and the law limits their expenditure of public money to public purposes, but they are also representatives of their constituents, and delegates of the city's legislative powers, and there is nothing in the law or in sound public policy to prohibit the city from being honest, and paying its bona fide debts which are good in conscience and justice, though for sufficient other reasons, there is a general rule which prevents them from being enforceable by law."

Applying that principle to the case at hand, we can paraphrase by saying that the members of the General

Assembly are representatives of the people and there is nothing in the law or in sound public policy to prohibit the State from being honest, and paying its bona fide debts which are good in conscience and justice, even though there be a constitutional provision which seems to (but does not actually) prohibit the payment of the honest debt. In the case at hand the State owes at the very least an honest, straightforward appreciation toward the policeman who patrols his beat in the storm, heat and cold for 20 years, facing dangers which lurk behind the curtain of night and within the dark caverns of crime; it owes equal gratitude to the fireman who for 20 years responds to alarms which take him into burning buildings and under falling masonry and broken brick; it is likewise beholden to the City employe who for the same number of years faithfully discharges every requirement of his duties. And if certain governmental instrumentalities, through legislative authority, contract to pay the employe, fireman or policeman, so many silver dollars, they do not honestly discharge their obligations by paying the pensioner an equivalent number of half dollars or quarters.

The State and all its municipal subdivisions, as well as corporations, business houses, railroads and transportation companies have in recent years all increased the pay of employes. Had the pensioners herein concerned been separated from service at a later date, they would also have come under the protective roof of increased retirement pay. Are they to be excluded because age has intervened? Which is more important: elemental justice or the fortuitous working of the calendar?

The prohibition in Article III, Section 11 of the Constitution does not apply to Acts 355, 239 and 252.

It must be kept in mind that when we look at any section of the Constitution (apart from amendments) we are appraising something that was written in 1874 and we must endeavor to ascertain what were the intentions of the framers of the document. The Majority Opinion seems to proceed on the theory that constitutional provisions are iron-ribbed compartments built into a reinforced steel tabernacle. The history of the constitutional convention and the decisions of this Court rendered since 1874 would indicate, on the contrary, that the various provisions in the Constitution are not metallic cubicles; rather they represent vast areas of moral principles which permit such cultivation as will produce provender, protection, and preservation for the people, restricted only by very specific prohibitions clearly and unequivocally expressed in 1874. It seems obvious to me that the prohibition in Article III, Section 11 was never intended to prohibit the Legislature from discharging a moral obligation to the servants of the State. The target of the prohibition was political favoritism. It was designed to prohibit the enrichment of individuals by rewarding them from the public treasury. The fact that the limitation is worded in the singular number, rather than in the plural, adds particular emphasis to this interpretation. In 1952 in the case of *Francis v. Neville Township,* 372 Pa. 77, this Court declared unconstitutional a township ordinance which sought to pay a pension to *one* certain retired township employe. Interpreting various provisions of the Constitution, including Article III, Section 11, we said: "Knowing the evils inherent in individual power and authority, the framers of all written democratic constitutions aim at prohibiting grants, monetary and otherwise, to *single persons.* Unbridled financial chaos would result if municipal bodies

were permitted to monetarily reward *specific individuals,* no matter how praiseworthy their services and how profound their devotion to the welfare of the particular township, board or city."

But in the case before us we are concerned not with any certain individual but with three large classifications of employes. In fact, we said in the *Francis v. Neville Township* case that the pension there under consideration would have been upheld had the ordinance provided for pensions for a whole classification: "In view of the fact that pension systems are now common to practically all employments, both governmental and private, the township authorities might well have found a plan under the law to compensate Cledwyn D. Francis *and others in his classification* for long and faithful services."

It is also to be noted that the constitutional prohibition is against *extra* compensation which, of course, would be predicated upon the supposition that full compensation has already been paid. However, when the payment actually made falls short of what was agreed upon, it cannot be said that the further payment is extra compensation. The increased retirement benefits provided by the legislation under consideration merely adds to the three-fourths-filled milk bottle the extra fourth which has been withheld.

The Majority disposes of this litigation almost entirely on the authority of *Koehnlein v. Allegheny County Employees' Retirement System,* 373 Pa. 535, but the stream of reasoning in that case flows through a different area of litigation from that involved here. In the *Koehnlein* case this Court had under consideration the Act of January 14, 1952, P. L. 1884, which, without any additional contribution from the pensioner, increased his retirement benefits after he had already

been separated from the service. The three statutes before us, on the contrary, specifically provide that the pensioner must pay into the retirement fund the additional sum of $200 before he can be eligible for increased retirement benefits. This arrangement between the pension fund and the pensioner is thus but an extension of the contract originally entered into between the two parties when the employe first entered the retirement system.

The Majority says: "Defendants and intervenors contend that the voluntary contribution of $200 by the pensioner in return for the annuity creates a contractual relation between him and the pension board, and is not 'extra compensation' prohibited by the Constitution . . ." This, of course, is an incorrect premise. The defendants and intervenors do not contend that the contractual relation between the pensioners and the pension funds involved came into being with the contribution of $200. The contractual relation began when the pensioner *first* entered the retirement plan. The contract did not begin after the pensioner had left public service; it was in existence while he was in the service and it continued to be valid and binding while enjoying some of the benefits he had contracted to receive. The contract being executory, as we establish in *Retirement Board v. McGovern*, 316 Pa. 161, 177, the parties have the right to modify or alter it as they see fit.

The contract can in fact embrace services already completed before the mutual obligations arise. In the *McGovern* case we held that credit could be given for duties performed prior to the passage of the Retirement Act there considered. Thus, if the Legislature may authorize retirement credit on the basis of previous services, it certainly can direct payment for services here-

tofore rendered when those services form an integral part of the mosaic of full payment. The increased retirement benefits being considered here are benefits which were potentially contemplated at the time of the formation of the contract between the parties.

The Majority Opinion puts the rhetorical question: "Does the voluntary contribution of $200 remove this Act from the constitutional inhibition?" And answers the question: "We think not." There is the suggestion throughout the Majority's reasoning in this case that the $200 is not sufficient to actuarially support the amounts which the Pension Funds would be required to contribute. But it is not the province of the Court to inquire into the nature of the consideration which the Legislature deems adequate to support a contract which it authorizes, any more than it is the duty of this Court to probe into the make-up of a legislative budget. In the case of *Haldeman v. Hillegass,* 335 Pa. 375, the employe made one contribution to the retirement fund and retired *only three days later.* It was urged against him that he could not qualify under the retirement system. This Court, however, said that even one payment was sufficient to "entitle a member to retirement pay," explaining: "This is in effect an acknowledgment by the legislature of *prior service,* and a recognition by it that long and faithful public employment should be compensated, emphasizing the purpose and scope of the provisions for retirement pay or delayed compensation."

If the soundness of a retirement system is to be based on individual cases, naturally there will be found instances here and there where the returns to the beneficiaries seem to be out of proportion to the contributions made. That possibility exists in all insurance contracts. One may suffer a serious accident after payment of only one premium and then receive an annuity for

life. However, insurance companies work out their programs on overall, long-range calculations which have been proved generally to be profitable to the insured and the insurer. It may be in the crystal ball of fate that one or more of the pensioners here involved may make a contribution of $200 and not even receive one payment of annuity. But that would not prove that the legislation is unconstitutional or unfair. It was well stated by Chief Justice STERN, in another connection, in the case of *Equitable Credit and Discount Co. v. Geier*, 342 Pa. 445, 450, that: ". . . legislation dealing with social and economic problems cannot be expected, and is not constitutionally required to be of mathematical exactitude."

In working out a retirement system for governmental employes the Legislature takes into consideration not only the matter of suitable compensation for services rendered but also the matter of offering inducements which will bring into government service competent persons who are willing to accept whatever disadvantages go with public service on condition that they will be assured economic security in their old age. It is not for the Courts to appraise what that means to the government in dollars and cents.

The Legislature has recognized that the governmental agencies here involved have not paid to the pensioners what it was agreed they were to receive. To this extent, therefore, the Pension Funds have altered the basic contract. It needs no citation of authority to establish that contracts may not be altered unilaterally. Thus, with both the governmental agency and the employe now agreed on rectification of a damaged agreement, I see no reason for the court to interpose objection. The moral obligation resting on the State, plus the further financial contribution being made by

the pensioner, more than constitutionally justifies the increased retirement benefits voted by the Legislature.

In support of its position the Majority cites the Wisconsin case of *Thomson v. Giessel,* 262 Wis. 51, but the decision in that case is based on an argument which has not been recognized as valid by this Court. The Wisconsin case proceeded upon the theory that deductions from employes' wages constitute a donation by the State. But we have consistently held that the employe's contributions to the Retirement Fund are his own private funds. Furthermore, the *Thomson* case does not now represent the latest law on the subject in Wisconsin. Since the *Thomson* decision, the Wisconsin Legislature enacted legislation which would allow the State to increase retirement benefits to retired employes by asserting that retired employes must hold themselves available for emergency service. *State v. Giessel,* 265 Wis. 558. Thus, the present Wisconsin law and the Pennsylvania law are alike in this respect: the Wisconsin law requires the retired employe to perform potential additional services for additional retirement benefits and the Pennsylvania law requires that the retired employe make an additional contribution in money for his increased retirement benefits.

Furthermore, so far as out-of-State decisions are concerned, there is no reason why this Court should be persuaded more by the *Thomson* case in Wisconsin than the *Raines* case in Illinois. The case of *Raines v. Board of Trustees of Illinois State Teachers' Pension and Retirement Fund,* 365 Ill. 610, is practically on all fours with the case at bar. There, the Illinois Legislature provided that retired teachers could obtain increased retirement benefits by making a contribution of $200. The Illinois constitution contained a prohibition similar to the one in the Pennsylvania constitu-

tion. The Supreme Court of Illinois upheld the constitutionality of the legislative measure, saying: "The right of the State to contract for the payment of annuities to its officers and employees under prescribed conditions is not challenged and has been repeatedly upheld. No reason is observed why the parties to such a contract may not make provision for an optional increase of the annuity by providing for additional contributions to the fund. Under contracts based on optional voluntary contributions, the contributors have a substantial interest in the fund by virtue of the amounts paid in under the terms of the contract. The benefits to be derived are not gratuities from public funds for past services, and therefore *an increase in such benefits in consideration of further contributions does not violate the constitutional provision prohibiting extra pay for past services.* The fact that the contributions may be smaller than the payments required by insurance companies under experience and mortality tables to mature policies for similar amounts does not detract from the contractual relation. *The question of the wisdom of such rates is not within the province of the courts, but is a matter for the consideration of the Legislature."*

The Majority says, quoting from the *Koehnlein* case that "the plight of retired municipal employes because of the inadequacy of their retirement allowances in relation to the increased cost of living, particularly in the past few years, is regrettable to say the least." But this is scant comfort indeed, especially when the Legislature, which is the department of government entrusted with the responsibility of determining how much shall be paid by the Retirement Fund, has determined the method whereby the "plight of retired municipal employes" can be ameliorated. It is a drastic

thing to strike down a law enacted by representatives of the people. Of course, there are occasions when constitutional responsibility requires it but I do not see that that agency exists here. How a public retirement system shall be financed and how it shall be operated are matters within the exclusive province of the Legislature. In *Sharpless v. Mayor, etc.,* 21 Pa. 147, this Court said: "The constitution allows the legislature every power which it does not positively prohibit. The wisdom, justice or expediency of the passage of an act of the legislature is not the subject of debate in our courts of justice."

I believe that we have no right to interfere with the wisdom, justice or expediency of the Legislature in the passage of Acts Nos. 355, 239 and 252. However, if we did possess that supervisory power, I would say that,—under the Constitution which recognizes the moral obligation the State owes to faithful servants who have grown old in her service,—the Legislature was wise, just and expedient in lightening the burdens of the retired policemen, firemen and other timeworn employes as they descend the hill into the valley of every-deepening shadows.