610 A.2d 15

**Joseph R. GLANCEY, William Porter & Julian F. King, Appellants,**

**v.**

**COMMONWEALTH of Pennsylvania STATE EMPLOYES' RETIREMENT BOARD, Appellee.**

**Thomas N. SHIOMOS, Appellant,**

**v.**

**COMMONWEALTH of Pennsylvania STATE EMPLOYES' RETIREMENT BOARD.**

Supreme Court of Pennsylvania.

Argued Oct. 25 and Oct. 26, 1990.

Decided May 18, 1992.

482

John Rogers Carroll, Philadelphia, for Glancey.

Stephen P. Gallagher, Philadelphia, for Porter.

James E. Beasley, Barbara R. Axelrod, Philadelphia, for King.

Abbott A. Leban, Philadelphia, for appellee.

F. Emmett Fitzpatrick, III, Philadelphia, for Shiomos.

Before NIX, C.J., and LARSEN, FLAHERTY, ZAPPALA, PAPADAKOS and CAPPY, JJ.

## OPINION OF THE COURT

CAPPY, Justice.

This case presents the question of whether judges removed from office for disciplinary reasons, pursuant to Article V, Section 18 of the Pennsylvania Constitution, automatically forfeit their pension benefits by virtue of Article V, Section 16(b).

For the reasons set out as follows, we conclude that neither the history nor the language of the Constitution support a conclusion that Article V, Section 16(b) is meant to create a broad pension forfeiture provision.

### *Procedural History*

Involved in this appeal are four individual Petitioners whose cases have been consolidated at two docket numbers. As each Petitioner raises the identical issue we shall resolve the matter in one opinion, referring to separate facts when necessary.

The Petitioners are all former judges of the Commonwealth of Pennsylvania, who have been removed from judicial office by this Court. Such disciplinary action occurred after the Judicial Inquiry and Review Board (JIRB) of Pennsylvania, which is established pursuant to Article V, Section 18 of the state Constitution, recommended removal upon finding that each Petitioner judge had accepted small cash Christmas gifts (generally amounting to several hundred dollars) from a Roofers' Union in Philadelphia. Some of the Petitioner judges also failed to report such gifts on their mandatory Statements of Financial Interest, and furthermore made misrepresentations to federal agents when questioned about the receipt of these gifts.

Following removal from office, each of the Petitioner judges sought to collect his monthly pension benefits from the Commonwealth of Pennsylvania State Employees' Retirement System (SERS). Each application was denied by the State Employees' Retirement Board (SERB), under the purported authority of Article V, Section 16(b) of the Penn-

sylvania Constitution. The latter provision of the state Constitution states simply: "No compensation shall be paid to any justice, judge or justice of the peace who is suspended or removed from office under section eighteen of this article or under article six." However, Petitioners were permitted to withdraw that portion of the pension benefits which they had contributed themselves, along with statutory interest.

The particular facts relevant to each of these four cases may be briefly summarized as follows. Petitioner Joseph R. Glancey became a judge on the Philadelphia Municipal Court effective January 6, 1969. He remained in that office until he resigned on March 31, 1988, under the cloud of the Roofers' Union scandal. JIRB, in due course, recommended the removal of Petitioner Glancey based upon his misconduct. Prior to the matter being argued and reviewed by this Court, however, he resigned. This Court reviewed the record of JIRB and entered an order which "forever barred (Glancey) from holding judicial office in this Commonwealth." *See, In the Matter of Glancey,* 515 Pa. 201, 527 A.2d 997 (1987) (*Glancey I*) and *In the Matter of Glancey,* 518 Pa. 276, 542 A.2d 1350 (1988) (*Glancey II*).

When Petitioner Glancey filed an application seeking to withdraw his own pension contributions and seeking to receive a reduced retirement allowance for the rest of his life, SERB denied his request. The Board determined that Petitioner Glancey was entitled to no more than the return of his own contributions, plus statutory interest. The Commonwealth Court affirmed. *See, Glancey v. Commonwealth of Pennsylvania, State Employees' Retirement Board,* 126 Pa.Commw. 457, 560 A.2d 263 (1989).

The second Petitioner, William Porter, was appointed to the Court of Common Pleas of Philadelphia County on December 30, 1971. He was elected to a full ten-year term commencing January 7, 1974, and was reelected to a second term commencing January 2, 1984. Judge Porter received $300 from the Roofers' Union under unacceptable circumstances during the year 1985, but did not engage in any

cover-up after that investigation was made public. By Order dated February 25, 1988, this Court directed that Petitioner Porter be suspended from judicial office, forfeit his office, and furthermore declared Petitioner's office to be vacant. *See, Matter of Cunningham,* 517 Pa. 417, 538 A.2d 473, *appeal dismissed sub nom. White v. Judicial Inquiry and Review Board,* 488 U.S. 805, 109 S.Ct. 36, 102 L.Ed.2d 16 (1988).

On July 22, 1988, SERB denied Petitioner Porter's request for his vested retirement benefits.[1] A divided panel of the Commonwealth Court affirmed, holding that since Porter had "forfeited" his office, this was akin to "removal" under Section 16(b) and, therefore, he was not entitled to retirement benefits. *See, Porter v. Commonwealth of Pennsylvania, State Employees' Retirement Board,* 129 Pa.Commw. 290, 565 A.2d 512 (1989). The Commonwealth Court noted that if Petitioner Porter was elected or appointed to judicial office in the future—a possibility which was not precluded by his suspension—he would be entitled to become a member of SERS again. However, his pension benefits would only run from that date forward. *Id.,* 129 Pa.Commonwealth at 295, 565 A.2d at 515, n. 4.

Petitioner Julian F. King was appointed to the Court of Common Pleas, Philadelphia County, in December of 1971, at which time he became a member of SERS. He was elected to a ten-year term commencing November of 1973, and was re-elected to another ten-year term in November of 1983. On July 20, 1988, this Court entered an Order directing that Judge King be removed from office; that his salary cease from that date forward; and that he thereafter be ineligible to hold judicial office. *See, Cunningham.* The evidence indicated that Judge King had received $200 in

1. Petitioner Porter contends that he had become a member of SERS as early as 1958, when he served as an Assistant Attorney General and thereafter as an Assistant District Attorney and Assistant City Solicitor for the City of Philadelphia. However, SERB found otherwise, determining that his entry into the system commenced on December 30, 1971, when he was appointed to the Court of Common Pleas. Because there was no hearing on the above issue, this Court is not able to address the merits of such factual dispute.

cash in 1983, $200 in cash in 1984, and $300 in cash in 1985. It also indicated that Judge King had failed to report such gifts on his financial disclosure forms in 1984, the first year such forms were mandatory.

On May 17, 1988, Petitioner King filed an application with SERS seeking to withdraw a lump sum amount equal to his own contributions plus statutory interest, along with a reduced retirement allowance for life. SERB denied this request, with the exception of permitting King to withdraw his own contributions, plus interest. The Commonwealth Court affirmed. *See, King v. Commonwealth of Pennsylvania State Employees' Retirement Board,* 129 Pa. Commw. 444, 566 A.2d 323 (1989).

Finally, Petitioner Thomas N. Shiomos served as a judge on the Court of Common Pleas of Philadelphia County from January 3, 1973 until his retirement on March 1, 1984. At the time of his retirement he began receiving a monthly pension benefit of $1,883.61 from SERS. Thereafter, this Court granted Petitioner Shiomos status as a Senior Judge, pursuant to the power set forth in Article V, Section 16(c) of the Pennsylvania Constitution. In this capacity, Judge Shiomos served on an as-needed basis, with his last assignment on the Philadelphia Court of Common Pleas during the month of November, 1986. On November 18, 1986, Chief Justice Nix revoked the order assigning Petitioner a seat on the Court of Common Pleas, thus ending his service.

On November 28, 1986, JIRB commenced disciplinary proceedings against Petitioner Shiomos, and on August 5, 1987 recommended that he be removed from office. The Board found that Shiomos had accepted cash gifts on at least six occasions from the Roofers' Union, and had lied to FBI agents in an attempt to cover up his misconduct. On November 4, 1987 this Court entered the following Order:

AND NOW, this 4th day of November, 1987 the recommendation of the Judicial Inquiry and Review Board in the instant proceeding is accepted, and it is ORDERED that respondent, Thomas N. Shiomos, be forever barred from judicial duties or office.

On July 20, 1988, the State Employees' Retirement Board (SERB) entered an order suspending payment of retirement benefits to Shiomos, citing Article V, Section 16(b) of the Pennsylvania Constitution. The Commonwealth Court sitting *en banc* approved the termination of Petitioner Shiomos' retirement benefits. *See, Shiomos v. Commonwealth of Pennsylvania State Employees' Retirement Board,* 128 Pa.Commw. 39, 562 A.2d 969 (1989).

In each instance, appellants herein filed a petition for allowance of appeal to this court pursuant to 42 Pa.C.S.A. § 724(a), and those petitions were granted.

### Discussion

This case brings into collision two competing concerns of the highest order in our society. First, that public officials—including judges—who betray the public trust, must expect to endure the most weighty sanctions for their conduct. Second, in conflict with the first, is the concern that no individual—even an errant public official—should be stripped of his or her contractual right to receive deferred compensation, *see McKenna v. State Employees' Retirement Board,* 495 Pa. 324, 433 A.2d 871 (1981) (Nix and Flaherty, JJ., concurring) (pension benefits are based upon contract theory of deferred compensation), without explicit statutory or Constitutional authority.

In unraveling this conundrum, we begin by observing that the language of Article V, Section 16(b) of the Pennsylvania Constitution is inherently ambiguous. In full, Section 16 of the Constitution provides as follows:

Sec. 16. Compensation and retirement of justices, judges, and justices of the peace

(a) Justices, judges and justices of the peace shall be compensated by the Commonwealth as provided by law. Their compensation shall not be diminished during their terms of office, unless by law applying generally to all salaried officers of the Commonwealth.

(b) Justices, judges and justices of the peace shall be retired upon attaining the age of seventy years. Former

and retired justices, judges and justices of the peace shall receive such compensation as shall be provided by law. No compensation shall be paid to any justice, judge or justice of the peace who is suspended or removed from office under section eighteen of this article or under article six.

(c) A former or retired justice or judge may, with his consent, be assigned by the Supreme Court on temporary judicial service as may be prescribed by rule of the Supreme Court.

Section 16(b) nowhere uses the word "pensions" or "retirement benefits" in referring to that which is forfeited by reason of a judge's removal. Rather, the word "compensation" remains undefined in the Constitution, thus requiring a broader analysis of the language and history of Section 16(b) in order to derive that term's meaning.

First, with respect to the language, the inherent ambiguity is heightened by the juxtaposition of Sections 16(a) and 16(b) in the Constitution, which deal with distinct subjects yet allow a common sentence to straddle the two provisions. Section 16(a) traces its origin to the Constitution of 1790, and provides that full-time judges shall be "compensated by the Commonwealth as provided by law." Section 16(b) owes its origin to the Constitutional Convention of 1967–68, and deals primarily with former and retired judges. The latter provision mandates the retirement of judges at age 70; it provides that former and retired judges "shall receive such compensation as shall be provided by law;" it finally includes a sentence dealing with removal from office, which ostensibly applies to *both* sitting and former or retired judges, creating an overlap between 16(a) and 16(b). It is this final sentence, hung in limbo between two otherwise unrelated constitutional provisions, which generates the confusion in the instant case. It states as follows:

No compensation shall be paid to any justice, judge or justice of the peace who is suspended or removed from office under section eighteen of this article (the JIRB

provision) or under article six (the impeachment provision).

The first question is what the word "compensation" means in Section 16(b). The Commonwealth Court in *Glancey*, in its effort to make sense of this imprecise language hung between two sections, found it significant that the word "compensation" is used in Section 16(b), while the word "salary" is used in other parts of the Constitution, including Section 18(h).[2] This difference in language, according to the Commonwealth Court, indicated that Section 16(b) was meant to broadly encompass all sorts of "compensation," including pension benefits.

However, we find this distinction to be a hollow one. Sitting judges receive a "salary."[3] Former or retired judges do not; they receive "compensation" at irregular intervals, because they sit by special appointment only. The framers of Section 16, having drafted the language to straddle both 16(a) and 16(b), had no choice but to use the word "compensation" in the latter provision, since it referred to both sitting judges (who draw a regular paycheck), and former or retired judges (who receive only sporadic remuneration). The word "compensation" in Sec-

---

**2.** Article V, Section 18(h) is the JIRB provision which states that upon removal or suspension, a judge's *"salary* shall cease from the date of such order." (emphasis added). Judge Barry, writing for the Commonwealth Court in *Glancey*, turned to Webster's Dictionary for definitions and concluded that retirement benefits are necessarily a form of "compensation" rather than "salary." He wrote:

> A review of these definitions shows that "salary is a part of a total compensation package, more specifically, *present* compensation. Public retirement benefits, again, are *deferred* compensation. Once a judge is removed and therefore has forfeited his office, no more services may be rendered and no more salary can be due. It necessarily follows that the section 16(b) prohibition against paying 'compensation' to a removed judge must refer to deferred compensation, i.e., retirement benefits. *Id.,* 126 Pa.Commonwealth at 462, 560 A.2d 263 at 266.

> As explained above, the problem with this sharp distinction between the words "salary" and "compensation" is that it ignores the pivotal fact that Section 16(b) is referring to *both* sitting judges and former or retired judges, making the word "salary" inapposite here.

**3.** A "salary" is defined as "fixed compensation paid regularly (as by the year, quarter, month or week) ..." Webster's Third International Dictionary at 2003 (1966).

tion 16(b) thus supplies no hidden clue to the Framers' intent; in this context, no other word (including "salary") would have made sense.

Nor is it significant, as the Commonwealth Court seeks to suggest in *King*, that a subcommittee of the Constitutional Convention changed the word "salary" back to "compensation" two days before the end of the Convention. *King*, 129 Pa.Commw. at 449, 566 A.2d at 327. This change occurred only after it was discovered that a subcommittee on style and drafting had inadvertently interchanged the words. *Id.* Such a correction in language was therefore perfectly consistent with the interplay between Section 16(a) and Section 16(b), discussed above, since the drafters intended the language to apply to both full-time and former or retired judges. Moreover, the comments of Delegate Barry, at the time the change in wording occurred, indicate that it had nothing to do with pension benefits.[4]

We therefore conclude that the language of the Constitution does nothing to solve the question whether pension benefits are meant to be included within the term "compensation" under Section 16(b). It becomes necessary to explore the history of the Constitutional Convention of 1967–68, in order to attempt to derive an understanding of the Framers' intent in drafting this inherently ambiguous provision.

**4.** Delegate Barry stated on the floor of the Convention:

"Mr. President, this language was taken out by Style and Drafting. We think it is a substantive change and we ask that it be reinstated. Delegate Curran and myself as co-chairmen of the sub-committee recommend this, and it is with the consent of Delegate Amsterdam and Governor Scranton.

We feel if there is an order by the Supreme Court for suspension or removal of a judge, this states, the suspension or removal shall take effect as of the date of that order. It provides the salary shall cease from the date of that order. This is not taken care of by the language in the retirement section ..." *II Journal of the Constitutional Convention.* 1373, Feb. 29, 1968.

Delegate Barry is Judge Francis A. Barry, now of the Commonwealth Court and the author of the Commonwealth Court opinion in the *King* case *sub judice.*

After an exhaustive review of that constitutional history, we conclude that there was very little discussion of the pension issue; that there was *no consensus* among the drafters whether this language should have any application to pensions whatsoever; and that the weight of history suggests that a *majority* of the subcommittee intended the Constitution to remain purposely silent on the matter of pension forfeiture, and meant to leave the matter exclusively in the hands of the legislature.

We begin by observing that the Journal of the Constitutional Convention of 1967–68 reveals little discussion of pension benefits, generally, in the context of Section 16(b). Indeed, the last sentence of 16(b) attracted little attention throughout the debates, because the bulk of the discussion centered around fixing a mandatory retirement age of 70 for judges in the Commonwealth, as well as the related issue of allowing competent judges to be appointed on an as-needed basis, after retirement.[5]

The history of the Convention reveals only sporadic mention of the pension issue under what became Section 16(b). One of the earliest meetings of the Sub–Committee on Retirement and Post–Retirement Service of Judges shows an agreement by the sub-committee to consider the following broad issue: "Should the question of pensions—qualifications, amount, etc.—be dealt with in the Constitution?"[6]

5. The matter of permitting former and retired judges to be "appointed" on a temporary basis was part and parcel of the "mandatory retirement age of 70" issue, which dominated the Convention and gained widespread attention. Judges would be automatically retired at age 70, to confront the sensitive issue of mental and physical competency on the bench. At the same time, former and retired judges who were competent would be eligible for appointment on a temporary basis, assuaging those who believed that "good judges" should be given an opportunity to serve, regardless of age. It is this interlocking arrangement between the first and second sentences of Section 16(b) which dominated the debate and subcommittee work, along with the creation of the Judicial Inquiry and Review Board under Section 18, which was modeled after a similar ethics board in California. *See,* Memorandum from Committee on the Judiciary, Feb. 12, 1968. SA–113.

6. Minutes of Sub–Committee on Retirement and Post–Retirement Service of Judges, Dec. 12, 1967. SA–1. *See, also,* Minutes of Sub–

The history reveals a lack of consensus each time that issue was subsequently raised. It is true, as the Commonwealth Court in *King* pointed out, that certain members of the sub-committee recommended language which would have defined "compensation" in pension-like terms in the new constitutional provision, linking it to a ceiling of "seventy-five percentum" of the judge's last salary. *King, supra,* 126 Pa.Commonwealth at 452, 566 A.2d at 327. However, the official minutes make clear that this was a *minority* proposal, and a *majority* of the sub-committee resisted any language linking the word "compensation" with retirement benefits.[7] To the contrary, it was the position of the majority that a great deal of latitude should be given to the legislature in dealing with the issue of pensions under what became Section 16(b), and that the new Constitutional language should be drafted in general terms to allow broad flexibility to the legislative branch.[8] The following language in the sub-committee's minutes of January 25, 1968, bears out this point:

"2. *Retirement Compensation Benefits*—

This sub-committee was unable to agree on how this subject should be treated in the Constitution. While there was general agreement that only former justices and judges who had completed at least one term in office and those who retired or were retired for mental and physical disability should be entitled to retirement compensation, *there was disagreement as to whether these restrictions and others ... should properly be included in the Constitution.* The majority of the Committee ... take the view that specific details and restrictions as to pensions are properly questions for the legislature and not the Constitutional Convention. They believe that the Convention should draft as flexible a document as possi-

Committee on Retirement v. Post–Retirement, Jan. 25, 1968, raising the same question. SA–31.

7. Committee Action Report, Sub–Committee on Retirement of Judges, Jan. 17, 1968. SA–25–26.

8. *Id. See, also,* Minutes of the Sub–Committee on Retirement and Post–Retirement, Jan. 25, 1968. SA–34–35.

ble and that if what they consider to be statutory details are included in the Constitution, the effective life expectancy of that document will be unnecessarily shortened ..." [9]

It is significant that throughout this debate in the sub-committee, the language relating to the forfeiture of "compensation" by removed judges—now the critical language in Section 16(b)—was already in place. Such language had appeared in the first draft proposal of the sub-committee as early as December 20, 1967. [10] Thus, it is clear that the word "compensation" did not encompass "pension benefits," in the early stages of the convention which drafted Section 16(b), since that very issue was still being debated by the sub-committee without consensus.

Moreover, it is significant that each time the sub-committee addressed the pension issue in the context of this new constitutional provision, it specifically used the words "Retirement Compensation Benefits," [11] indicating that it clearly understood the difference between this term and the generic term "compensation" for purposes of the pension forfeiture provision.

As late as February 8, 1968, in reviewing drafts of Proposal 7, which included the provision which later became Section 16(b) relating to compensation forfeiture, the Judiciary Committee issued a memorandum containing the following query: "Section 14(b) L.10—Does 'compensation' include pension to which a judge may have a vested

9. *Id.* SA–38–39. (Emphasis added).
10. Committee Action Report, Sub–Committee on Retirement of Judges, Dec. 20, 1967. SA–8. The proposal contained provision for:
"1) Mandatory retirement of judges and justices at age 70;
2) former judges and justices to be compensated as prescribed by legislature, except that removed judges not entitled to such compensation;
3) former justices or judges may be assigned by Chief Justice of Supreme Court."
11. *See,* Minutes of the Sub–Committee on Retirement and Post–Retirement, Jan. 25, 1968, SA–34–35, discussed *supra.*

right?" [12]   This the only direct evidence of the pension forfeiture issue being addressed.  After the February memorandum, the question continued to remain unanswered by the sub-committee; nothing appeared in the later minutes or the language of the proposal to indicate that the sub-committee's previous ambivalence ever changed.[13]

The language and history of the provision which became Article V, Section 16(b) of the Pennsylvania Constitution at the close of the Constitutional Convention, on February 28, 1968, thus leads to the inescapable conclusion that the authors of that provision never reached any consensus whether the word "compensation" should include retirement benefits with respect to the pension forfeiture provision of Section 16(b).  To the contrary, the majority of the sub-committee drafting the language wished to leave the Constitution purposely silent on this matter, in order that it would be dealt with *in toto* by the legislature.[14]

12. Memorandum of Judiciary Committee dated February 8, 1968. SA–108.

13. It is true, as the Commonwealth Court in *King*, pointed out, that an undated memorandum was circulated to the delegates by the co-chairmen of the Committee on the Judiciary, Gustave G. Amsterdam and William Scranton, which sought to explain the revised Judiciary Article as follows:

"[T]he mandate that no compensation shall be paid to a judge removed from office under Section (18) or pursuant to Article VI, the impeachment proviso, is an exception to the grant of legislative discretion in the payment of retirement compensation." *King*, 129 Pa.Commw. at 449, A.2d at 327.  *See*, SA–139.

However, this undated, unofficial "analysis" by individuals who did not draft the language, can hardly be viewed as dispositive.  When viewed in context of the numerous passages in the official minutes which indicate that the sub-committee was undecided, and that a majority of the drafters wished to leave the matter of pensions entirely to the legislature, this single wisp of history to the contrary only buttresses the conclusion that the Committee and Sub-committee were hopelessly undecided on the issue.

14. Judge Barry's opinion in *King* is certainly entitled to great deference in view of the fact that he was a Delegate to the Convention and served on the Sub–Committee on Incompatible Activities of Judges, as co-chairman.  However, the recollections and instincts of one delegate, thirty-two years later, whatever his stature, do not a Constitution make.  It is the very purpose of recorded minutes, official records and

Not only does an exhaustive review of the Journal and minutes of the Constitutional Convention compel this conclusion, but a host of other considerations convince us that Section 16(b) was not meant to be a pension forfeiture provision.

First, there has been no provision in the Pennsylvania Constitution dealing with pension forfeiture for over 200 years. Although the Constitution has explicitly dealt with the subject of judicial "compensation" since the year 1790,[15] and has inferentially required that pensions be treated as part of the adequate "compensation" mandated by Section 16(a),[16] the matter of pensions, including pension forfeiture,

the language of the final end-product, to guide this Court through the labyrinth of history.

15. Article 5, Section 2 of the Pennsylvania Constitution of 1790 provided in relevant part:

"The judges of the supreme court and the presidents of the several courts of common pleas shall, at stated times, receive for their services an adequate compensation, to be fixed by law, which shall not be diminished during their continuance in office ..."

16. A host of decisions emanating from this Court have made explicit what has been implicit from time immemorial in this Commonwealth—that pension benefits are a type of "deferred compensation" within the meaning of Article V, Section 16(a), which requires that members of the judiciary receive adequate "compensation" as set by the legislature. *See Goodheart v. Casey*, 521 Pa. 316, 555 A.2d 1210 (1989); *Klein v. Employees' Retirement System*, 521 Pa. 330, 555 A.2d 1216 (1989); *Catania v. Commonwealth State Employees' Retirement Board*, 498 Pa. 684, 450 A.2d 1342 (1982); *McKenna v. State Employees' Retirement Board*, 495 Pa. 324, 433 A.2d 871 (1981); *Wright v. Retirement Board of Allegheny County*, 390 Pa. 75, 134 A.2d 231 (1957). As Chief Justice Nix noted in *Klein*, this Court has repeatedly "recognized retirement benefits as part of the total compensation package, subject to the original contract of employment." *Id.* 521 Pa. at 351, 555 A.2d at 1227 n. 2, *citing Catania*, 498 Pa. at 705–708, 450 A.2d at 1345–47 (Nix, J., Opinion in Support of the Grant of Summary Judgment). Justice Flaherty has similarly stated in interpreting Section 16(a): "Retirement benefits are not a gratuity; they are deferred compensation and should be viewed as such. To change the terms by which retirement benefits are calculated strike at the heart of the compensation package." *McKenna*, 495 Pa. at 337, 433 A.2d at 877 (Flaherty, J., concurring). *See, also,* opinion of Justice Larsen in *Klein*, holding that the "unified judicial system" established by Article V, as well as Section 16(a), require that judges performing similar functions be paid the "same rate of compensation," and this included retirement benefits. *Id.* 521 Pa. at 340, 555 A.2d at 1221.

historically has been left to the legislature. Indeed, at the time of the Constitutional Convention in 1967–68, legislation existed which comprehensively governed the pension rights of judges in this Commonwealth.[17] We believe that if the framers of Section 16(b) would have intended to alter the *status quo* and bring an entirely new subject—pension forfeiture—into the language of the Constitution, it would have done so in explicit terms.

Second, not only do the minutes of the Convention suggest that the matter of pension forfeiture was intended to be left to the legislature, but the legislature of this Commonwealth specifically enacted a statute in 1978 which dealt with this topic, in a comprehensive fashion. The Public

However, this Court's sensible decisions holding that pension benefits are part of the adequate "compensation" *See, Goodheart,* mandated by Article V, Section 16(a), which the legislature may not diminish arbitrarily, does not compel a conclusion that pension benefits are necessarily "compensation" within the meaning of the quite distinct Section 16(b), relating to pension forfeiture. First, it must be underscored that Section 16(a) derives from the Pennsylvania Constitution of 1790, and has a well-marked history nearly as old as this Commonwealth. *See,* n. 15, above. Section 16(b), on the other hand, is an infant in terms of Constitutional history, and was added in 1967–68 with precise objectives recorded in the minutes and official records. To conclude that "compensation" must include pension benefits for purposes of 16(b), simply because it is included in the adequate "compensation" mandated by 16(a), is to whitewash over the Constitution and ignore the context and history of the language. Section 16(a) is a *positive* provision, which assures an adequate compensation established by the legislature, and prevents that compensation from being diminished while a judge is in office. Section 16(b) is a *negative* provision, at least in the third sentence applicable herein, and strips away remuneration otherwise owing a justice, judge or justice of the peace as a punitive measure. Thus, it can hardly be said that the two provisions can be read in *pari materia.*

Indeed, because Section 16(b) is a negative provision which strips away rights, it would threaten to contradict and run afoul of our long line of cases treating pensions as a contractually guaranteed element of "compensation" under Section 16(a), if it were to be loosely interpreted to diminish rights without strict constitutional safeguards not present in the language of Section 16(b).

17. Retirement benefits for state employees, including judges, were provided for in the State Employees' Retirement Code of 1959, 71 P.S. Sec. 1725–101—1725–809, and in legislation creating the State Employees' Retirement System, 71 P.S. Sec. 1731—1758.3. These provisions have since been repealed and replaced.

Employee Pension Forfeiture Act of 1978, 43 P.S. Sec. 1311 *et seq.,* establishes a specific and uniform method for the forfeiture of pensions by public officials, where certain "crimes related to public office or public employment" have been committed. Section 1313(a) of that law provides for forfeiture of pension benefits as follows:

> *"Disqualification and Forfeiture of Benefits.* (a) Notwithstanding any other provision of law, no public official or public employee nor any beneficiary designated by such public official or public employee shall be entitled to receive any retirement or other benefit or payment of any kind except a return of the contribution paid into any pension fund without interest, if such public official or public employee is convicted or pleads guilty or no defense to any crime related to public office or public employment."

Section 1312 of the Act defines "crimes related to public office or public employment" in great detail, spelling out twenty-two specific offenses which shall trigger the pension forfeiture provision. Section 1313 allows the return of the public official's contribution into the pension fund, but allows SERB to retain such contributions until it is determined whether a fine or restitution is required. *Id.* Sec. 1313(a), (d), and (e). The Act also deals with the difficult issue of vesting, by providing that: "Each time a public officer or public employee is elected, appointed, promoted or otherwise changes a job classification, there is a termination and renewal of the contract for purposes of this Act." *Id.* Sec. 1313(c). In short, the Pension Forfeiture Act provides a clear, detailed, comprehensive scheme with regard to the forfeiture of pensions. By its terms, it is specifically made applicable to "justices, judges and justices of the peace ..." *Id.* Sec. 1312.

If this Court were to read the words "pension benefits" into Article V, Section 16(b) of the Pennsylvania Constitution, words which do not exist, the result would be to render the Pension Forfeiture Act of 1978 largely meaningless, particularly as it applies to the judicial branch. Rather than

following the specific statutory scheme established by the legislature, *any* removal of a judge by this Court for any reason, great or small, would lead to an automatic extinguishment of retirement benefits under Section 16(b). Not only would such a reading render the Pension Forfeiture Act a nullity as it applies to judges, but it would force the Pension Forfeiture Act into the black hole of unconstitutionality, because it would create an irreconcilable conflict between that Act and Section 16(b).

Third, such an interpretation of Section 16(b) would result in a treatment of judges which is different from, and more drastic than, the treatment accorded to all other public officials under the Pension Forfeiture Act. It is beyond peradventure that if Petitioners were members of the legislative or executive branches of government, including the Governor or the highest ranking public officials serving in the Pennsylvania Senate, they would forfeit their retirement benefits only in accordance with the detailed strictures of the Pension Forfeiture Act. Although it is abundantly clear that members of the judiciary must be held to extremely high standards given the public trust which is reposed in them, other public officials are held to the same high standards. The Pennsylvania legislature has spelled out these standards in the Pension Forfeiture Act. Any reading of the Constitution which would treat one co-equal branch of government differently, and more harshly, than any other branch of government—whether the legislature, executive, or judiciary—particularly where a matter as fundamental as retirement benefits is at stake, must come as a result of an explicit, rationally-based Constitutional directive, rather than by judicial fiat.

Fourth, an interpretation of Section 16(b) which requires an automatic forfeiture of pension benefits, upon removal of a judge for any reason, would lead this Court into a quagmire of contractual dilemmas. Is the judge entitled to a return of his or her own pension contributions, as is authorized under Section 1313(a) of the Pension Forfeiture

Act? [18]  Is the judge entitled to statutory interest?  Is a
judge entitled to recover that portion of the pension which
has already vested, as Petitioner *Glancey* has requested,
thus treating the retirement contract as divisible into seg-
ments? [19]  None of these weighty questions can be an-
swered with reference to Article V, Section 16(b) of the
Constitution, because—unlike the detailed provisions of the
Pension Forfeiture Act—the Constitution simply does not
address any of them.

Respondent SERB, in effect, would have us draft a code
of pension forfeiture law and append it to Section 16(b),
allowing that Board to write its own rules based (ironically)
upon the procedures already established under the Pension
Forfeiture Act.  It would have us construct a rule that a
judge may receive a return of his or her past pension
contributions, as is authorized under Section 1313(a) of the
Pension Forfeiture Act, while SERB would be authorized to
permanently withhold the balance.  But under what Consti-
tutional authority?  It would have us conclude that the
judge is entitled to statutory interest on his or her benefits
returned.  Under what language of the Constitution?  The
reason the Framers of Section 16(b) did not deal with these
critical contractual issues was not due to inartfulness, but
because Section 16(b) had nothing to do with pension bene-
fits.  Any interpretation of Section 16(b) to the contrary
would yield a multitude of contractual complexities, about
which the Constitution is tellingly silent.

Fifth, and perhaps most importantly, an interpretation of
Section 16(b) requiring automatic forfeiture of retirement

18.  In each of the cases at bar, SERB authorized the return of such
pension contributions, presumably pursuant to Section 16(b); howev-
er, there is nothing in the Constitution which deals with this critical
issue.

19.  Petitioner Glancey has requested that this divisibility approach be
followed, if Section 16(b) relates to pension benefits at all.  It is
interesting to note that then-Justice, now Chief Justice Nix had sug-
gested this approach in *Miller v. Com., State Employees' Retirement
Board,* 498 Pa. 103, 445 A.2d 88 (1981) (Nix, J., concurring), in
illustrating the problems inherent in the Public Employees Pension
Forfeiture Act of 1978 to the extent that statute sought to apply
retroactively to pensions already vested.

benefits any time a judge is removed from office, for any reason, would seriously undermine the flexibility afforded this Court by the suspension and removal provisions of the Constitution. Article V, Section 17(b) states that "Justices and judges shall not engage in any activity prohibited by law and shall not violate any canon of legal or judicial ethics proscribed by the Supreme Court." Section 18(h) allows this Court to order suspension or removal of a jurist, upon the recommendation of JIRB, wherever this Court finds such a remedy to be "just and proper." *Id.* Taken together, these provisions grant wide latitude to this Court to suspend or remove judges for a host of reasons, some involving serious misconduct, others not involving proof of misconduct at all. This Court may discipline a judge for the "appearance of impropriety," even where no crime or misconduct is proven, in order to ensure that the public confidence in the judiciary is not undermined. *See,* Code of Judicial Conduct, Canon 2. This Court may suspend or remove a judge for inappropriate behavior completely unrelated to the individual's duties on the bench, where such aberrant behavior, although not a violation of the law, may jeopardize the "high standards" and "integrity" of the judicial branch. *Id.* Canons 1 and 2. This Court may remove a judge for physical or mental infirmity, however delicate the issue, and may utilize Article V, Section 18(h) to discipline, suspend or remove judges for the tiniest to the gravest infractions, wherever it is determined that the public interest is best served by this flexible tool.

An interpretation of Section 16(b) which would automatically require pension forfeiture, each time this Court in its best judgment disciplined a judge for the sake of preserving public confidence, chills rather than fosters the scheme established by JIRB and the Constitution.

Loss of retirement benefits, particularly where an individual has invested many years of service on the bench, is a serious matter. It strips an individual of his or her expectation in remuneration for services already performed. Often it seriously impacts upon a spouse and family, who have

ordered their lives in reliance upon the eventual receipt of a pension check. In Pennsylvania, a pension is marital property subject to distribution, *King v. King,* 332 Pa.Super. 526, 481 A.2d 913 (1984), thus allowing a spouse to rely upon payments even in the case of a divorce.

If Section 16(b) were interpreted as Respondents urge, this Court would be forced to make a pension forfeiture decision each time it invoked the JIRB provisions, for any reason, whether it involved acceptance of a gift, inappropriate public intoxication, or conduct relating to physical or mental infirmities of a judge for which he or she may not even be responsible. If the Journal of the Constitutional Convention of 1967–68 makes anything clear, it is that the purpose of JIRB and related constitutional provisions was to vest wide latitude with this Court, to suspend or remove not only for crimes and morally reprehensible conduct, proven with certainty, but for *any* conduct which might shake the public's confidence in the judiciary. Requiring automatic pension forfeiture under Section 16(b) would frustrate this flexible mandate; it would force this Court to adopt the extreme penalty of pension forfeiture, effecting judges and their families for life, even where such a dire consequence may be far too serious a punishment to fit the crime, or lack thereof.

## CONCLUSION

It is certainly appropriate for judges—like all public officials—to forfeit their expectation in future pension benefits where their conduct has malevolently betrayed the public trust in their office. The legislature of Pennsylvania has established a detailed statutory scheme to determine which conduct of judicial officers shall trigger such pension forfeiture. *See,* 43 P.S. Sec. 1311 *et seq.* At the same time, the language of Article V, Section 16(b) of the Pennsylvania Constitution is conspicuously silent on matters dealing with pension forfeiture. Our review of the language and history of that provision suggests that the Framers intended this Constitutional hush. If certain conduct of judges and other

public officials is serious enough to warrant a surrendering of pension, it shall be enumerated explicitly in the Pension Forfeiture Act. If certain judicial conduct should be covered by the Act, which is not already covered, the legislature need only amend that statute to broaden its reach.

However, it was not intended that this Court should strip a judge of retirement benefits each time it imposes removal under the JIRB provisions, without any regard for the nature or severity of the conduct at issue. Such a constitutional straight-jacket was specifically avoided by the Framers of Section 16(b). Nor is it required by the language of the Constitution. Given the need for flexibility and case-by-case options in the realm of sanctioning judges, the Constitution wisely leaves the *distinct issue* of pension forfeiture to the legislative branch.[20]

For all of the reasons set forth above, the judgments of the Commonwealth Court in the above cases are hereby REVERSED.

LARSEN, J., did not participate in the decision of this matter.

**20.** In response to the dissent, it is respectfully noted that the only issue addressed by the majority herein is whether the Constitution of Pennsylvania mandates the forfeiture of pensions of justices, judges and justices of the peace each time the disciplinary provisions of JIRB are invoked. Because we concluded that Article V, Section 16(b) of the Constitution is silent as to the issue of pension forfeitures, it naturally follows that the majority had no reason to address the separate issue of when pension benefits might cease with respect to the Appellants or any other public officials removed from office. This matter concerns interpretation of the Pension Forfeiture Act, an issue that is not before us today. Thus, when the dissent concludes that,

"[t]oday's holding by the majority, allow[s] all compensation to survive until the effective date of the order of removal or suspension ..." (Nix, C.J., dissenting, p. 30.),

the dissent has unfortunately misconstrued the holding of the majority. As so aptly noted in the joining concurrence of Mr. Justice Papadakos, the Constitution of Pennsylvania simply does not address the forfeiture of pensions of justices, judges or justices of the peace. The mechanics of such pension forfeiture, if indeed a forfeiture is worked with respect to any particular Appellant, must be dictated by an interpretation of the precise statutory language of the Pension Forfeiture Act. Such a question is not before us today. It must be resolved if and when such an issue becomes ripe for consideration.

McDERMOTT, J., did not participate in the consideration or decision of this matter.

PAPADAKOS, J., files a joining concurring opinion in which ZAPPALA, J., joins.

NIX, C.J., files a concurring and dissenting opinion in which FLAHERTY, J., joins.

PAPADAKOS, Justice, concurring.

I join in the opinion authored by Mr. Justice Cappy because, in its well-reasoned and comprehensive review of a very difficult area of the law, it reaches a conclusion in which I am in full accord. Section 16(b) of Article 5 of the Constitution of Pennsylvania does not provide for the forfeiture of judicial pensions under any circumstances. I believe that the legislature filled in the blanks with a later statute which we will consider on another day, in an other context.

ZAPPALA, J., joins this concurring opinion.

NIX, Chief Justice, concurring and dissenting.

While I concur with that part of the majority's opinion which concludes that the decision of the Commonwealth Court affirming the Board's order of total loss of retirement benefits to the Appellants herein is an unjustifiable forfeiture of their "deferred compensation", I must disagree with the result of that holding which allows these jurists to maintain their total retirement benefits up until the effective date of the order of suspension or removal. For the reasons that follow, I would conclude that Article V, § 16(b) of our Constitution, given its intended effect, *allows for the termination of a judge's prospective pension benefits effective the date, as determined by the Judicial Inquiry and Review Board, the jurist committed the act of misconduct while in office which was the predicate for removal.*

From the beginning of our civilization those who were favored to serve as judges were deemed to be members of society whose integrity could not be questioned and whose

judgment was accepted as sound and above reproach. The grant of power to a judge recognizes that those who serve in that capacity, although sharing the failings of all humans, were individuals who were expected to withstand the temptations of life and, therefore, could properly judge others who possessed less resolve to meet that standard. This unusually high standard is reflected in our Canons of judicial ethics which demand more of a judge than merely obeying the existing law. The Canons of judicial behavior expressly provide that we avoid *even* the appearance of impropriety. Code of Jud. Conduct, Canon 2, Subd. (B). Those Canons expressly dictate that overt misbehavior may not be condoned.

In each instance before us today, the dereliction has been established and is *not* being challenged. Those issues have been resolved by our decisions in *Matter of Cunningham*, 517 Pa. 417, 538 A.2d 473 (1988) and *In re: Glancey*, 518 Pa. 276, 542 A.2d 1350 (1988). The situation is further exacerbated as the conduct in question is not related to the personal behavior of the jurist but rather concerns the jurist's behavior in the performance of his judicial duties. The *only* issue presented is the appropriate response to that errant behavior. Our response must, therefore, be appropriate to that behavior which caused damage to the integrity of the judicial process and its image. I do not believe that we can ignore the magnitude of the breach nor the irreparable damage it has cast upon the integrity of this system.

For the reasons that follow, I am constrained to conclude that the majority's result serves to compound the damage caused by the conduct it intends to sanction. The instant situation afforded the opportunity for this Court to re-enforce its previously expressed intention to maintain the integrity of the jurists of this Commonwealth. *Matter of Cunningham*, 517 Pa. 417, 538 A.2d 473 (1988). To the contrary, today's decision signals to all that our previous posture, enunciated in *In re: Glancey*, 518 Pa. 276, 542

A.2d 1350 (1988), was merely an aberration and business as usual will prevail.

In recognition of the august nature of a jurist's position in our society, both our Constitution and General Assembly enacted requirements that public officers, including judges, take an oath prior to entering upon the responsibility of office. This required oath of office and an individual's inclusion in the State Retirement Plan independently operate to create a contractual relationship between the jurist involved and the State. Specifically, Article VI, Section 3 of the Pennsylvania Constitution requires that all public officers including members of the judiciary take a designated oath of office. The required oath is as follows:

"I do solemnly swear (or affirm) that I will support, obey and defend the Constitution of the United States and the Constitution of this Commonwealth and that *I will discharge my office with fidelity.*"

Pa.Const. Art. VI, § 3 (emphasis added).

The requirement that an oath of office be taken by members of the judiciary was codified by the Legislature pursuant to 42 Pa.C.S. § 3151 which reads as follows:

§ 3151. **Oath of Office**

Each judicial officer shall, *before entering on the duties of his office,* take and subscribe the following oath or affirmation before a person authorized to administer oaths:

"I do solemnly swear (or affirm) that I will support, obey and defend the Constitution of the United States and the Constitution of this Commonwealth and that I will discharge the duties of my office with fidelity."

*Any person refusing to take the oath or affirmation shall forfeit his office.* A judicial officer shall be sworn upon his appointment or election, and after each retention election, and thereafter need not be sworn in any matter referred to him.

42 Pa.C.S. § 3151 (emphasis added).

As the statute explicitly states, the taking of the oath is an prerequisite to "entering upon the duties" of office. *Com-*

*monwealth ex rel. Kelley v. Keiser,* 340 Pa. 59, 69, 16 A.2d 307 (1940). It necessarily follows that the oath of office is also a precondition to receiving any compensation for the performance of those duties, as one clearly may not receive payment for services one has not performed. Thus, it is the very oath of office itself which enables a judge to commence his duties and accordingly earn that compensation due him, including the pension benefits payable to a jurist.

In addition to the statutory requirement imposed upon those assuming the esteemed and powerful position of judge that an oath of office be taken, the oath *itself* imposes additional obligations upon the jurist. The oath of office required to be taken mandates that a judge "discharge the duties ... of office with fidelity." 42 Pa.C.S. § 3151. Implicit in this language is the notion that compliance with this pledge is a predicate to receiving the benefits of office and conversely failing to abide by the oath must result in a simultaneous termination of a jurist's entitlement to the emoluments of office.

The relationship between a public employee and the State Pension Plan is necessarily contractual in nature containing various mutual obligations. "It is well established that retirement benefits are founded upon a contract theory of deferred compensation." *McKenna v. State Employes' Retirement Board,* 495 Pa. 324, 334, 433 A.2d 871, 876 (1981) (Nix, J., concurring) (citing *Harvey v. Allegheny County Retirement Board,* 392 Pa. 421, 141 A.2d 197 (1958); *Baker v. Retirement Board of Allegheny County,* 374 Pa. 165, 97 A.2d 231 (1953); *McBride v. Allegheny County Retirement Board,* 330 Pa. 402, 199 A. 130 (1938); *Retirement Board of Allegheny County v. McGovern,* 316 Pa. 161, 174 A. 400 (1934)). I agree with Judge Barry of the Commonwealth Court when he so aptly noted:

> What Glancey fails to recognize is that Sections 16 and 18 of Article V constitute "terms and conditions" upon which the receipt of retirement pay is premised. Put another way, at the time Glancey joined the system, that system provided that a judge could collect retirement pay unless

he was removed from office under Section 18 of Article V.

*Glancey v. State Employes' Retirement Board,* 126 Pa.Commonwealth Ct. 457, 463, 560 A.2d 263, 266 (1989). Accordingly, once the jurist engaged in conduct which was sufficiently violative of his oath of office to warrant suspension or removal, that act of misconduct serves to instantaneously sever the jurist from that very system which provided him a process for entitlements to the emoluments of his office. Accordingly, I would hold that the Board must calculate the loss of the Appellant's prospective retirement benefits only up until that date determined by the Judicial Inquiry and Review Board to be the first instance of misconduct engaged in by each jurist.

While the Order of the Board and its subsequent affirmance by the Commonwealth Court requiring the total loss of all state contributions to the pension funds of Appellants constitute an impermissible forfeiture, calculating the loss of prospective pension benefits from *the date of misconduct* effectuates the economic consequence of removal or suspension and is undeniably fair.[1] Under this analysis there can be no risk of "forfeiture" as the moment the jurist engages in misconduct he simultaneously breaches his contractual obligation with the State and his entitlement to rights and privileges due him terminates instantly. Thus, it is the jurist's own affirmative conduct which precipitates the breach of contract and termination of his pension benefits, not the Constitution nor this Court. Accordingly, there is no loss or deprivation of any property interest in which the jurist had a reasonable expectation or right to possess. Clearly, once a jurist tarnishes the bench with his betrayal of the public trust, from that moment forward he can no longer realistically expect continued financial support from

1. The effect of the majority's ruling today renders meaningless any economic distinction between a judge whose emoluments cease effective the date he retires in good standing and the Appellants herein who also receive their emoluments in full until the date of the order of suspension or removal. This is an affront to all jurists who retired after years of faithful and ethical service.

the very system offended by his actions. The jurist's entitlement to the financial emoluments of office ceased to exist once he engaged in "misconduct".

This conclusion is predicated upon my belief that the phrase "no compensation" as employed in Article V, Section 16(b) of the Pennsylvania Constitution explicitly provides this Court with the authority to terminate the *pension benefits* of a removed or suspended jurist. Article V, Section 16(b) of the Pennsylvania Constitution states:

> Justices, judges and justices of the peace shall be retired upon attaining the age of seventy years. Former and retired justices, judges and justices of the peace shall receive such compensation as provided by law. *No compensation shall be paid* to any justice, judge or justice of the peace who is suspended or removed from office under section eighteen of this article or under Article VI.

Pa.Const. Art. V, Section 16(b) (emphasis added).

Whenever this Court is called upon to interpret a particular constitutional provision, we are guided by the basic principle that "[c]onstitutional provisions are not to be read in a strained or technical manner. Rather, they must be given the ordinary, natural interpretation the ratifying voter would give them." *Commonwealth ex rel. Paulinski v. Isaac,* 483 Pa. 467, 475, 397 A.2d 760, 765, *cert. denied,* 442 U.S. 918, 99 S.Ct. 2841, 61 L.Ed.2d 286 (1979). Where more than one interpretation is possible, it is appropriate to "favor a natural reading which avoids contradictions and difficulties in implementation, which completely conforms to the intent of the framers, and which reflects the views of the ratifying voter." *Id.,* 483 Pa. at 477, 397 A.2d at 766. A constitution reflects the will of the people; thus, the people's natural understanding of the terms therein must be given full effect. *Commonwealth v. Harmon,* 469 Pa. 490, 366 A.2d 895 (1976); *Berardocco v. Colden,* 469 Pa. 452, 366 A.2d 574 (1976); *Firing v. Kephart,* 466 Pa. 560, 353 A.2d 833 (1976); *Breslow v. School District of Baldwin Township,* 408 Pa. 121, 182 A.2d 501 (1962).

A natural reading of the last two sentences of this provision would require the word "compensation" to carry the same meaning in both instances. "Compensation" is generally understood to refer not only to salary but also to retirement benefits. *See Catania v. Commonwealth, State Employes' Retirement Board,* 498 Pa. 684, 690, 708, 450 A.2d 1342, 1345, 1349 (1982); *Bellomini v. Commonwealth, State Employes' Retirement Board,* 498 Pa. 204, 209–10, 445 A.2d 737, 739 (1982). The choice of word "compensation" in this context indicates the framers' intent to encompass salary and retirement benefits.

While the plain meaning of "compensation" as used in this context suggests the inclusion of retirement and pension benefits in addition to salary, a thorough analysis of Section 16 in its entirety, compels the same conclusion. Section 16(b) also states that "[f]ormer and retired justices, judges, and justices of the peace shall receive *such compensation as shall be provided by law."* Pa. Const. Art. V, § 16(b), (emphasis added). The only compensation to which a former or retired judge is *entitled* after he or she retires or leaves office is the accrued retirement benefits resulting from service as an active judge. Any additional compensation obtained from service as a senior judge is not included since that retired or former judge does not have a right to serve in senior service, but rather serves only at the pleasure of this Court. Additionally, the compensation received by senior judges does not accrue from service rendered as an active judge, but rather from the services rendered as a senior judge. Section 16(c) allows only former or retired justices or judges to be assigned to "temporary judicial service." Pa. Const. Art. V, § 16(c). Despite their explicit inclusion in Section 16(b), justices of the peace are *not* eligible for temporary judicial assignments under Section 16(c). The "compensation" referred to in Section 16(b) for former or retired justices or judges may include remuneration for temporary judicial assignments, but it must also include retirement and pension plans, because justices of the peace are not authorized to perform temporary judicial

service. Thus, to hold that "compensation" does not include one's retirement or pension contribution would contradict Section 16(b)'s mandate that former and retired justices of the peace receive "such compensation *as shall be provided by law.*" Pa. Const. Art. V, § 16(b) (emphasis added).

While I believe that Section 16 *itself* operates to define "compensation" to include pension benefits, an analysis of other constitutional provisions also supports such an interpretation. Preliminarily, it should be noted that the Constitution grants certain powers and outlines a specified procedure, in general, to deal with the disciplining of judges. First, the Constitution creates a Judicial Inquiry and Review Board (J.I.R.B.), Pa. Const. Art. V, § 18(a), and empowers it to investigate those jurists who have been charged with misconduct, Pa. Const. Art. V, § 18(d). Once the J.I.R.B. investigation warrants an appropriate punishment, the Board is authorized to recommend to this Court "the suspension, removal, discipline, or compulsory retirement of the justice or judge." Pa. Const. Art. V, § 18(g). The last remaining phase of the process, is for this Court to implement the recommendations of the J.I.R.B., implement any of the enumerated sanctions that are "just and proper", or reject the recommendations wholly. Pa. Const. Art. V, § 18(h). However, should an order for suspension from office or removal be issued, "the justice or judge shall be suspended or removed from office and his *salary shall cease* from the date of such order." Pa. Const. Art. V, § 18(h) (emphasis added).

Today's holding by the majority, allowing all compensation to survive until the effective date of the order of removal or suspension, clearly disregards the fact that the Legislature chose to employ different terms at different times because they intended those words to convey different definitions. The explicit reference to the term "salary" in Section 18(h) further reassures us that the term "compensation" as used in Section 16(b) was intended to have a separate and distinct meaning. This deliberate reference to the term "salary" in Section 18(h) above, unquestionably

demonstrates that the drafters of the Constitution were well aware of the differences in meaning between "salary" and "compensation." Their selective use of the two words thus, was intentional, rather than inadvertent and we are bound to effectuate and oblige such intent. *See, Commonwealth ex rel. Paulinski v. Isaac, supra; Commonwealth v. Harmon, supra.* Therefore, while the language of Section 18(h) requires the termination of a jurist's "salary" effective the date of the Order of removal or suspension is issued, it does not prohibit the termination of pension benefits from occurring earlier. Clearly an employee is entitled to collect a wage while continuing employment; however, no entitlement exists on behalf of a removed or suspended jurist to collect pension benefits, an emolument of office provided in exchange for faithful service, once he engages in misconduct. If the term "compensation" in Section 16(b) were intended to refer to salary only, Section 18(h) would be redundant. Clearly, the framers did not intend such a result as they understood that the two terms were not interchangeable.

Next, those who fail to recognize that the concept of "compensation" is a broad classification of which salary is merely a component or subsection are vulnerable to an unintended consequence resulting from their position. Article V, Section 16(a) referring to the "compensation" of judges, states in relevant part: "[T]heir compensation shall not be diminished during their terms in office, unless by law applying generally to all salaried officers of the Commonwealth." Pa. Const. Art. V, § 16(a). If compensation merely refers to salary, then Section 16(a) solely protects against the diminution of salaries and leaves open the possibility for a future reduction in a jurist's overall benefits. Such an occurrence could legitimately occur under the latter interpretation.

I disagree and believe it is highly significant that Section 16(a) employs the term "compensation" rather than "salary" to assure that the value of the overall compensation package would not be diminished. This interpretation of

the word compensation would result in a more legitimate and intended outcome, that protection against erosion extends beyond maintenance of a mere salary level, but rather to the entire compensation package including medical benefits and retirement funds.

Prior to the 1968 Amendments, Section 26 of Article III (formerly Section 11) of the Pennsylvania Constitution prohibited the passage of legislation giving "extra compensation" to any public employee after services had been rendered. In *Jameson v. City of Pittsburgh*, 381 Pa. 366, 113 A.2d 454 (1955), and *Koehnlein v. Retirement System for Employees of Allegheny County*, 373 Pa. 535, 97 A.2d 88 (1953), this Court construed that language "extra compensation" to be violated by state statutes authorizing increases in retirement allowances to already retired public employees. Thus, it had already been determined and firmly established almost forty years ago by this Court that "compensation" included retirement benefits. At the time of the 1967–68 Constitutional Convention therefore, when the provisions of Section 16 were being drafted, the term "compensation" had previously been employed with reference to retirement benefits. Accordingly, any assertion that the term "compensation", as intended and employed in Section 16(b), is ambiguous cannot be plausible as it clearly disregards the historical and common understanding and usage of the term.

Thus, pursuant to this analysis, I believe a proper resolution of this matter would necessitate directing the Board to calculate the value of the appellants' pension plans as follows.[2]

The retirement benefits of former Judge Glancey who took judicial office in January of 1969, vested in January of

2. Former Judge Shiomos lost his pension benefits pursuant to the Public Employees Forfeiture Act, ("Act 140") P.S. 752, No. 140, §§ 1–5, 43 P.S. §§ 1311–15. Judge Shiomos currently has a case pending before this Court challenging the constitutionality of "Act 140". Shiomos v. State Employes' Retirement Board, No. 85 E.D. Appeal Docket, 1991. The resolution of this matter has been reserved for the appropriate time.

1979. His misconduct occurred in December of 1985. Accordingly, the State Employes' Retirement Board would be directed to calculate former Judge Glancey's benefits up to the date of the misconduct.[3]

Similarly, former Judge Porter originally took office in December of 1971, so his pension benefits vested as of December 1981. His misconduct, like Glancey's, occurred in December of 1985, and the S.E.R.B. would be directed to calculate pension benefits up to the date of that misconduct.

Former Judge King was also first appointed to the bench in December of 1971, and his pension rights vested in December of 1981. Former Judge King first breached his oath by committing misconduct in December of 1983. Accordingly, the Board would be directed to compute the value of his retirement benefits as of that date. Such a consequence is required at a minimum and the preservation of judicial integrity in this Commonwealth demands no less.[4]

FLAHERTY, J., joins in this concurring and dissenting opinion.

---

**3.** As this conclusion indicates, I expressly disagree with the Board's conclusion that the state's contribution prior to the misconduct should be disturbed.

**4.** Notwithstanding the majority's insistence that the course of action suggested in this dissent constitutes a "forfeiture", we conclude that a jurist's entitlement to the emoluments of office automatically ceases upon the occurrence of his affirmative act of misconduct that was the predicate for the suspension or the removal. A forfeiture implies the taking of something to which a person was entitled. Once the oath is breached, there is no basis for entitlement.